[No. S011868. Apr. 11, 1994.]

In re STANLEY WILLIAMS on Habeas Corpus.

**COUNSEL**

McCambridge & Deixler, McCambridge, Deixler, Marmaro & Goldberg, Bert H. Deixler, Manatt Phelps, Rothenberg & Tunney, Leslie A. Swain, Brodey & Price and Howard R. Price for Petitioner.

John K. Van De Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, Jr., and Carol Wendelin Pollack, Assistant Attorneys General, Carol A. Greenwald, Donald E. de Nicola, Marc E. Turchin, Ivy Kessel, Joan Comparet, Jane Catherine Malich, Susan Lee Frierson and Sharlene A. Honnaka, Deputy Attorneys General, Ira Reiner, District Attorney, Harry B. Sondheim, George M. Palmer and Patricia H. Horikawa, Deputy District Attorneys, for Respondent.

## OPINION

**LUCAS, C. J.**—Over five years ago, we affirmed the judgment of guilt, the finding of special circumstances, and the sentence of death in this matter. (*People* v. *Williams* (1988) 44 Cal.3d 1127 [245 Cal.Rptr. 635, 751 P.2d 901].) At the same time, after first issuing an order to show cause and ordering an evidentiary hearing, we also denied an initial petition for a writ of habeas corpus (Crim. No. 23806), in which petitioner asserted the prosecutor illegally used a jailhouse informant to solicit incriminating evidence from him. (44 Cal.3d at pp. 1140-1141, 1158.)

In January 1989, we denied a subsequent habeas corpus petition (S008526) that raised, inter alia, the same jailhouse informant issue rejected earlier. Thereafter, petitioner sought relief in the federal district court, which stayed a pending execution date and ordered petitioner to exhaust claims not previously presented to this court. Petitioner filed the present petition (S011868), which again raised, inter alia, the jailhouse informant issue, but which contained new material allegations based on previously unavailable information. Thereafter we issued to the Director of the Department of Corrections an order to show cause why petitioner's death sentence is not invalid because it is based on jailhouse informant evidence that was obtained in violation of defendant's Sixth Amendment rights under *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] (hereafter *Massiah*), and *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183] (hereafter *Henry*). We subsequently ordered a second evidentiary hearing and reappointed Judge Paul Egly (who had served as our referee in the initial habeas corpus proceeding (Crim. No. 23806)) as referee. Judge Egly's report is now before this court, as are the parties' postevidentiary hearing briefs. For the reasons explained below, we will deny the petition and discharge our order to show cause.

### Facts and Procedure

The facts are stated in our initial opinion (*People* v. *Williams, supra,* 44 Cal.3d at pp. 1133-1138). As relevant here, they are as follows:

Petitioner, along with three others, robbed and murdered a convenience store employee. Two weeks later, he robbed and murdered three members of a family who owned and operated a motel. At trial, petitioner was linked to these crimes by: (i) immunized testimony of Alfred Coward, one of petitioner's cohorts in the first killing, who testified that petitioner shot the store employee, and that petitioner told the others he did so because he did not want to leave witnesses; (ii) Coward's additional testimony that petitioner

laughed hysterically and mimicked the noises made by the store employee as he died; (iii) the testimony of a firearms expert that shotgun casings found at the scene of the motel murders were from a gun purchased by petitioner; (iv) immunized testimony by Samuel Coleman, who testified that petitioner told him on the day after the killings that he had killed some people who lived on Vermont Street (the site of the motel); (v) the testimony of both James and Esther Garrett, in whose home petitioner stayed approximately five days a week during the period in question, that petitioner admitted killing some "Chinese people" on Vermont Street; and (vi) the testimony of Esther Garrett that petitioner admitted the killings, and said he used the money to purchase the drug "PCP." (*People* v. *Williams, supra,* 44 Cal.3d at pp. 1134-1136.)[1]

In addition to this ample evidence linking petitioner to the killings, the prosecution offered the testimony of a jailhouse informant, George Oglesby, also known as "Gunner." As we noted in our opinion on appeal:

"At the time of his testimony, Oglesby had pleaded guilty to second degree murder, but had not been sentenced. He was originally charged with first degree murder, two counts of kidnapping, and one count of rape; special circumstances also were alleged. The special circumstance allegations were dropped at a Penal Code section 995 hearing. As a part of his plea, the remaining counts and a use allegation were to be dismissed. [¶] A supplementary probation report prepared on Oglesby indicated the charge eventually would be reduced to manslaughter because he was to testify in other cases. Oglesby also testified that he understood his attorney had spoken to the district attorney who was prosecuting defendant's case about reducing the charges against him to second degree murder. He also hoped to receive protective housing in another state." (*People* v. *Williams, supra,* 44 Cal.3d at p. 1136, fn. 5.)

Oglesby testified that petitioner admitted robbing a motel and shooting three people. Most important, however, Oglesby testified about petitioner's escape plans. As we stated in our opinion on the appeal:

"Oglesby testified that in late April defendant asked him about the chances of escaping from Atascadero or Patton, where he believed he might be sent. He later asked Oglesby if he wished to be included in an escape plan and Oglesby indicated he did. Defendant outlined a plan complete with

---

[1]Petitioner presented an alibi defense. Beverly McGowan claimed she was with petitioner on the night of the store employee's murder. Petitioner's stepfather, Fred Holiwell, and a fellow inmate, Eugene Riley, testified they saw petitioner at the Showcase Bar at the time of the motel killings.

drawings that involved escaping while being transferred from jail to court. According to the plan, as summarized by Oglesby, two people from 'the outside' would disarm the officer driving the bus. Defendant also planned to kill a person on the bus who was to testify against him, as well as the two officers who would accompany the bus. Defendant later modified the plan to include blowing up the bus in order to prevent the authorities from quickly determining who had escaped.

"Oglesby received two notes from defendant, one stating that a female visitor was not the girlfriend who was to be involved in the escape and the second stating that a female visitor had a new shotgun for him. A few days after receiving the notes Oglesby told Lt. Fitzgerald what he knew about the escape.

"After talking to Lt. Fitzgerald, Oglesby again communicated with defendant about an escape. In one note defendant stated that someone on the outside had obtained dynamite for him. Another note asked whether they should delay their escape because his brother had been sentenced to three months for an earlier attempt to help him escape from jail. Oglesby testified he told defendant that it probably would be better to escape earlier rather than wait. In another note defendant asked whether they should escape at his next court appearance or try to go to the Los Angeles County Hospital and attempt an escape from there. Another note stated that 'Blackie' [i.e., Coward] was a heartbeat away from death and asked if Oglesby's wife had made arrangements to get weapons. In a subsequent note defendant suggested giving Oglesby's wife's phone number to his girlfriend, observed that his girlfriend had gotten a pump shotgun, and stressed his hope that Oglesby's wife had weapons. The note also directed Oglesby to phone his wife and make plans so she could arrange a meeting with a woman named 'Lynn' to help with the escape.

"The first target date for the escape was June 12, 1979. The plan was aborted, however, because defendant had no way of arranging to get Oglesby to court at the same time. In addition, Oglesby testified that after one of defendant's court appearances, defendant told him he had to cancel the escape attempt because he believed two police vehicles were following the bus. He then altered the plan so the attempt would occur after they left court." (*People* v. *Williams, supra*, 44 Cal.3d at pp. 1136-1137.)[2]

A. *Issues raised on appeal and in the initial habeas corpus petition*

In our opinion on appeal, we addressed petitioner's claim that the prosecution's use of Oglesby to solicit incriminating information from him violated petitioner's Sixth Amendment right to counsel. We concluded, "[o]n

---

[2]Joseph McFarland, a jail inmate, testified it was well known that Oglesby was a "jailhouse snitch," and that other inmates regularly gave him false information.

the limited appellate record before us, we cannot determine whether Oglesby was a government agent [or] whether he deliberately elicited incriminating statements from [petitioner] . . . ." (*People* v. *Williams, supra,* 44 Cal.3d at p. 1138.) Accordingly, we rejected his Sixth Amendment claim on appeal.

While the appeal was pending, however, petitioner filed with this court his initial habeas corpus petition (Crim. No. 23806), which raised, inter alia, the same Sixth Amendment jailhouse informant claim. We issued an order to show cause, and ordered an evidentiary hearing, at which we instructed our referee, Judge Egly, to determine:

"(1) During what period of time, if any, was George Oglesby a 'paid government informant' as that term is used in *United States* v. *Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]?

"(2) During what period of time, if any, was defendant aware that George Oglesby was a 'paid government informant'?

"(3) Upon what occasions, if any, did George Oglesby deliberately elicit incriminating statements from defendant in violation of rules established in *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and *United States* v. *Henry, supra?*

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(5) Was defendant denied competent representation by counsel because counsel failed to object to the admissibility of George Oglesby's testimony on the ground that it violated the Fifth and Sixth Amendments to the United States Constitution and correlative provisions of the California Constitution?" (*People* v. *Williams, supra,* 44 Cal.3d at pp. 1138-1139.)

### 1. *Evidence elicited at the first evidentiary hearing*

In our initial decision in this case, we summarized Judge Egly's report and the testimony elicited at the first hearing as follows:

"[I]t is clear that defendant told Oglesby about the Brookhaven Motel murders sometime prior to May 21-22, when Oglesby recounted that conversation to Lt. Fitzgerald. Fitzgerald testified Oglesby also told him at the May 21-22 meetings of Williams's boast of killing a large number of Orientals, but Oglesby said it was sometime later. At one point Oglesby said he received the 'Blackie' note sometime early in May even though it bears the date of June 21; at another time he said it was after the May 21-22 meetings. It is apparent that the initial planning of the escape preceded May 21, including the delivery of the map and the two notes concerning Oglesby's wife. Sgt. Allender, who was assigned to prevent the escape, received

the 'dynamite' note from Oglesby on May 25, but it is not clear when Oglesby received it. Other notes, including all discussion of the role of Oglesby's wife, postdated May 25.

"Oglesby and Fitzgerald testified concerning their meetings. Fitzgerald recalled a meeting on March 5 in which Oglesby asked Fitzgerald to review the record in Oglesby's murder case and see if he could help; the next meeting between the two was May 21. Oglesby recalled the first conversation as earlier than March 5, and claims there were several other meetings before May 21. But they both agree defendant was not discussed until the meetings of May 21 and May 22, that Fitzgerald never asked or directed Oglesby to get information from defendant, and never promised any reward for such information.

"A few additional details appeared concerning the conversations between defendant and Oglesby. Most conversations took place on 'freeway time,' when prisoners were permitted to walk on the tier. Oglesby and defendant rarely discussed defendant's crime, but frequently discussed escape. Oglesby did not initiate these discussions or interrogate defendant, but neither was he a passive listener; drawing on his knowledge of police and courthouse routines (Oglesby had worked for a bail bondsman), Oglesby suggested a number of 'improvements' in the escape plan.

"Finally, the parties presented evidence concerning the competency of defense counsel. The evidence shows counsel was an experienced defense attorney and generally conducted a competent defense. He was, however, unaware of the decision in *United States* v. *Henry, supra*, 447 U.S. 264, which was decided about eight months before defendant's trial. Counsel neither investigated the factual basis for a constitutional objection to Oglesby's testimony nor did he research the legal grounds for such an objection, but decided instead to concentrate on attacking Oglesby's credibility.

"The referee submitted extensive findings, one of which, as we shall explain, disposes of defendant's Sixth Amendment claim. First, he found Oglesby was a 'paid government informant' from only May 25, 1979, until the conclusion of defendant's trial. The referee further stated: '[Defendant] has failed to prove by a preponderance that there was a deliberate eliciting of the incriminating statements furnished the Sheriff by Oglesby on May 21, 1979 and May 22, 1979 in violation of rules established in *Massiah* v. *United States, supra* [377 U.S. 201] and *United States* v. *Henry, supra* [447 U.S. 264]. *The only evidence that the referee has [as] to the post May 22, 1979 date is that Oglesby was permitted to remain in [defendant's] presence and that he did furnish information to Sgt. Allender. There is no evidence that Oglesby*

*either initiated conversations or interrogated [defendant] on behalf of any police agency, but [simply] passed on information given him by [defendant].'* (Italics added.)

"Finally, the referee found . . . that counsel's failure to undertake a sufficient legal and factual inquiry into grounds for objecting to Oglesby's testimony constituted unreasonable performance. He expressed no opinion whether counsel's conduct affected the outcome of the case." (*People v. Williams, supra,* 44 Cal.3d at pp. 1139-1140, italics in original.)

2. *Our initial resolution of petitioner's Sixth Amendment claim*

In our initial decision in this matter, we concluded that under *Kuhlmann v. Wilson* (1986) 477 U.S. 436 [91 L.Ed.2d 364, 106 S.Ct. 2616], there was no Sixth Amendment violation. "[I]n order to make out a Sixth Amendment claim under *Henry, supra,* 447 U.S. 264, and *Maine v. Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], 'the defendant must demonstrate that the police and their informant took some action, beyond their merely listening, that was designed deliberately to elicit incriminating remarks.' (*Kuhlmann, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at pp. 384-385, 106 S.Ct. at p. 2630].)" (*People v. Williams, supra,* 44 Cal.3d at p. 1141.)

We continued: "In light of *Kuhlmann,* we adopt the referee's implied finding that Oglesby was not a government agent during the period between his arrest and his conversations with Lt. Fitzgerald and Sgt. Allender on May 21-25. We recognize that the sheriff's department followed the practice of accepting information provided by inmates, and, when feasible, of rewarding inmates for providing that information. Oglesby (and likely all other inmates) was probably aware of that policy. But under the authorities we have reviewed, a general policy of encouraging inmates to provide useful information does not transform them into government agents; some specific action 'designed deliberately to elicit incriminating remarks' is required. [(*Kuhlmann, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at p. 384].)] Defendant has not shown sufficient state involvement to render Oglesby's actions during this period the actions of a government agent. Thus, we conclude the evidence that Oglesby revealed to Fitzgerald and Allender on May 21-25 (defendant's admission to killing three persons in a motel, the initial conversations about the escape plan, the map, and certain notes involving the escape) was not procured in violation of defendant's Sixth Amendment rights.

"The referee did find that Oglesby was a government agent from May 25 until the end of defendant's trial. Although this finding may well have been

correct under then-existing case law, it cannot be sustained in light of the intervening decision by the high court in *Kuhlmann, supra.* As shown by the above-quoted finding of the referee [citation], defendant has failed to carry his burden of establishing police action 'beyond their merely listening, that was designed deliberately to elicit incriminating remarks.' Instead, the referee appears to have found Oglesby was a mere governmental 'listening post,' which, according to *Kuhlmann,* raises no Sixth Amendment concern. We conclude defendant has failed to establish a Sixth Amendment violation." (*People* v. *Williams, supra,* 44 Cal.3d at p. 1141; see also *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1240-1241 [275 Cal.Rptr. 729, 800 P.2d 1159].)

### B. *Events leading to the second evidentiary hearing*

As noted above, in January 1989 petitioner filed a second petition for a writ of habeas corpus, in which he reasserted, inter alia, that Oglesby's testimony was admitted in violation of *Massiah, supra,* 377 U.S. 201, and *Henry, supra,* 447 U.S. 264. Petitioner failed, however, to allege facts supporting his claim. Accordingly, we concluded petitioner was not entitled to an evidentiary hearing merely to search for new evidence, and denied the petition. (S0008526, petn. den. Jan. 18, 1989.)

Thereafter petitioner filed the present petition, in which he alleged newly revealed facts in support of his renewed Sixth Amendment claim, and additional due process claims.[3] Petitioner's factual allegations included the following:

1. Lieutenant Fitzgerald, a member of the Los Angeles Sheriff's Office, used George Oglesby as an "informant" in a murder case in 1977, and in other matters. When Oglesby was booked into jail in early 1979, Fitzgerald executed a "special handling" request asking that Oglesby be placed in the "high power" unit, where accused murderers are housed. Petitioner was subsequently booked into that same unit in mid-1979. Because Oglesby was a known informant, under customary procedure he would have been sent to the "snitch" unit. The fact that Oglesby was diverted to the "high power" unit suggests Fitzgerald was using, or planned to use, Oglesby to collect information to be used against other inmates.[4]

2. In 1978, Fitzgerald, with Oglesby's knowledge, made a secret tape recording of a telephone conversation between Oglesby and Leslie White

---

[3]Specifically, petitioner alleged (i) the prosecution improperly withheld, at trial and at the initial evidentiary hearing, material evidence that discredited Oglesby's veracity and that revealed Oglesby was in fact a government informant; and (ii) Oglesby's testimony was false, and the prosecution knowingly presented that false testimony. (See *post,* pp. 611-612.)

[4]In support of the foregoing theory, petitioner cited the then-recent Report of the 1989-1990 Los Angeles County Grand Jury, Investigation of the Involvement of Jail House Informants in

(later revealed as a ubiquitous jailhouse informer). This tape, which was the subject of a discovery request, was not disclosed to petitioner at the prior evidentiary hearing. It allegedly shows that Oglesby and White conspired to fabricate testimony in an unrelated murder case, and that Fitzgerald, well before petitioner's case arose in mid-1979, used Oglesby as a means of securing information.

3. Another tape recording of a 1979 interview between Leslie White and investigators for the Los Angeles District Attorney's office contains charges by White that Oglesby had been forced to testify to bolster a "weak" prosecution case in another matter; that Lieutenant Fitzgerald attempted to assist White in fabricating an admission from a defendant named Bracero; and that Oglesby later told him (White) that Fitzgerald and Sergeant Allender "made him lie, told him, made him say what to say . . . ." Like the 1978 recording, this tape recording was the subject of a discovery order during the prior hearing, and again, it was not disclosed at that hearing.

4. Finally, an October 1989 declaration from Leslie White alleged, among other things, that Oglesby told him several times since 1981 "that he had 'put a story together' regarding confessions and admissions allegedly made by 'Tookie' Williams [petitioner], while Oglesby and Williams were incarcerated in the Los Angeles County Jail . . . . Mr. Oglesby informed me that putting the story together necessitated Mr. Oglesby's doing 'phone work.' That is, obtaining pertinent information by telephone from law enforcement officials to assist in the fabrication of statements. Mr. Oglesby informed me that he had gotten the 'stupid nigger' [petitioner] to draw a map to incriminate him in connection with an escape plan which Mr. Oglesby was manufacturing in an attempt to reduce Mr. Oglesby's own first degree murder charge."

The declaration continued: "Mr. Oglesby informed me that he was told by police Sgt. John Allender to 'go in there and get information' regarding Williams. Mr. Oglesby was told details pertaining to the investigation by Lieutenant Fitzgerald. I know this because Mr. Oglesby told me of Fitzgerald's statements."

After obtaining an informal response from the Attorney General (Cal. Rules of Court, rule 60), and based on the allegations in the petition, we determined there was sufficient cause to reopen our earlier inquiry into

the Criminal Justice System in Los Angeles County, pages 57-73. The grand jury found, contrary to testimony by various members of the Los Angeles Sheriff's Office, that placement of inmates for purposes of gathering information occurred in numerous cases during the time relevant here.

petitioner's Sixth Amendment claim under *Massiah, supra,* 377 U.S. 201, and *Henry, supra,* 447 U.S. 264, to determine what part, if any, of Oglesby's testimony might have been obtained and presented in violation of the Sixth Amendment. Because we were satisfied that any such violation was nonprejudicial insofar as it affected the guilt judgment or special circumstance findings, we limited our inquiry to the possible effect of any Sixth Amendment violation on the penalty judgment. Accordingly, we issued an order commanding the Director of the Department of Corrections to show cause in this court why petitioner's sentence of death is not invalid because it is based on evidence that may have been obtained in violation of rules established in *Massiah, supra,* 377 U.S. 201, and *Henry, supra,* 447 U.S. 264.

Thereafter, because the Attorney General's return raised disputed material facts on the jailhouse informant issue, we ordered a second reference hearing before Judge Egly. We directed our referee to answer two questions: "1. Was George Oglesby used by the government as an informant to solicit information from petitioner? [¶] 2. If so, on what occasions, and under what circumstances did George Oglesby elicit incriminating statements in violation of petitioner's Sixth Amendment rights? . . ."

C. *Evidence adduced at May 1992 evidentiary hearing*

The evidentiary hearing focused primarily on whether Fitzgerald and Oglesby had a "working relationship" from which it might be inferred that the government used Oglesby to deliberately elicit incriminating information from petitioner. Other factual allegations raised in the petition were shown, on closer scrutiny, to be benign or insignificant, and still others were simply never proved by the evidence. For example, as explained in the referee's factual findings, *post,* at pages 588-593, the testimony concerning the 1978 tape recording shed little light on the question whether Fitzgerald used Oglesby to solicit information from petitioner a year later. The evidence showed merely that Oglesby contacted Fitzgerald to secure his help when Oglesby thought that he was going to be "used" by, and falsely implicated by, Leslie White.

Most important, however, petitioner offered no evidence to support his final two (and most significant) factual allegations, both of which involved startling allegations by Leslie White. As noted above, in the 1979 tape recording, White asserted that Oglesby had told him, inter alia, that Fitzgerald and Allender had induced him to lie. And in the October 1989 declaration, White claimed Oglesby told him several times since 1981 that he had, at the request of the authorities, fabricated incriminating information— including the escape plan—and attributed it to petitioner in an attempt to reduce his own first degree murder charge.

Although petitioner planned to call Oglesby as a witness, Oglesby did not testify at the hearing because he died in prison one day before the hearing was scheduled to begin.[5] As explained below, most of petitioner's other scheduled witnesses—including Leslie White—refused to testify, invoking their Fifth Amendment right not to incriminate themselves. (See *post,* pp. 602-609.) Accordingly, at the evidentiary hearing petitioner failed to produce evidence supporting the most significant of the allegations that prompted issuance of our order to show cause and our order compelling an evidentiary hearing. The evidence presented consisted primarily of testimony by Officers Fitzgerald and Allender, and the prior testimony (from the initial evidentiary hearing) of Oglesby. We quote below our referee's factual synopsis following the hearing:

"The answer to [the] two questions [propounded by this court (see *ante,* p. 587)] can be found in the history of George Oglesby and his relationship with the Los Angeles County Sheriff's Department.

"This relationship commenced in 1976 when [then-] Sgt. Fitzgerald was informed that Oglesby [might] be privy to information respecting a murder involving the "Mexican Mafia" [in the] Bracero case, a matter which Fitzgerald was investigating. Fitzgerald went to a bail bondsman's office to meet with Oglesby respecting his knowledge. Oglesby was working for the bail bondsman as a bounty hunter or skip tracer. Prior to this, Oglesby had been an informant for several months for the United States Department of Alcohol, Tobacco and Firearms, but had not as far as it can be determined worked for any other agency within Los Angeles County. At this point in time, Oglesby had not been arrested or convicted of any felony.

"Oglesby informed the Sheriff's Department through Fitzgerald the information which helped to obtain a conviction in the Bracero case. Oglesby also had given Fitzgerald two check protector plates which were subsequently introduced as evidence at the Bracero trial.

"Prior to the Bracero trial, Oglesby had contacted Fitzgerald and informed Fitzgerald as to the location of a gun which was the subject matter of another of Fitzgerald's investigations. The information regarding this gun turned out to be correct.

"There is no record that[,] during these investigations by Fitzgerald, Fitzgerald paid Oglesby or gave anything of significant value to Oglesby.

"Fitzgerald was aware there was a social relationship between Leslie White and Oglesby. White was even then known as a notorious and unreliable informant. The knowledge of the relationship between White and

---

[5]Oglesby had been for many years under medical care for a heart condition.

Oglesby did not deter Fitzgerald from continuing to use Oglesby as an informant.

"During this period of time and pending the trial of the Bracero-Mexican Mafia case, Oglesby contacted Fitzgerald and told him of a purported scheme of White, who was confined to the Los Angeles County Jail, to be transferred to the Ventura County Jail in order to implement an escape plan. White further sought to implicate Oglesby as a possible suspect in his case in order that White could testify against Oglesby in Ventura and thereafter execute his own escape plan. Oglesby told Fitzgerald he did not wish to be implicated in such a scheme because of the threat to his own safety, the potential damage to Oglesby's own credibility and his desire to cooperate with the Sheriff's Department. Oglesby asked Fitzgerald to set up a telephone conversation between White and Oglesby. Oglesby was not in confinement. The subsequent phone conversation was initiated by White to Oglesby with Fitzgerald and his partner listening and taping the conversation.

"Additional dealings between Fitzgerald and Oglesby consisted of Fitzgerald seeking information from Oglesby as to a murder which had been committed in a parking lot of a Hollywood hotel where Oglesby was employed as a night clerk. This proved fruitless to Fitzgerald.

"Prior to the Bracero trial and Oglesby having to testify, Oglesby disappeared from the local scene and only after Fitzgerald consulted with White was Fitzgerald able to determine that Oglesby was located in New Mexico. Although Oglesby did not want to testify in the Bracero case, he returned voluntarily to California. The night of the day of testimony, Fitzgerald and the Sheriff's Department paid for Oglesby's motel room.

"The referee finds Oglesby attempted to maintain his relationship with Fitzgerald and Fitzgerald reciprocated during the balance of the years 1977-1978. Fitzgerald testified he had visited Oglesby's house on several occasions and further had purchased books, cigarettes and other types of amenities for Oglesby.

"Fitzgerald's testimony characterized his relationship with Oglesby as business-like. Oglesby described the relationship as friendly, social and business-like and he thought of Fitzgerald as a friend. Oglesby had an apparent need to be associated with law enforcement and actively sought out Fitzgerald. Fitzgerald's fellow officers in the Homicide Bureau characterized Oglesby as Fitzgerald's snitch and commented on the frequency with which Oglesby would call Fitzgerald and stop in at the office to see Fitzgerald.

Oglesby and Fitzgerald differed as to the frequency of contacts. The Referee finds the contacts between the two men to be approximately two or three times per month.

"Sometime prior to February 20, 1979, Fitzgerald was notified by his fellow homicide officers [that] Oglesby was under investigation for murder. The act constituting the crime included dismemberment of the victim. Fitzgerald was informed the arrest of Oglesby was impending. Shortly after Oglesby's arrest, Fitzgerald was informed of that fact. Immediately, Fitzgerald contacted the inmate reception center at the Los Angeles County Jail and requested special handling for Oglesby. Fitzgerald indicated in his testimony the request for special handling of Oglesby was made for the purpose of preserving the safety of Oglesby due to his activities as a witness in the Mexican Mafia case and because of his friendship with Oglesby as a human being. Exhibits . . . introduced in the 1992 hearing indicate the three reasons documented on the records of the Los Angeles County Jail for special handling of Oglesby were inconsistent with the reasons testified to by Fitzgerald.

"Petitioner questions Fitzgerald's statements of motivation for requesting special handling and placement of Oglesby in the high power cell block. Petitioner argues the real reason for the request for special handling was to place Fitzgerald's informer in a position to give valuable information. Oglesby was placed in the high power section of the jail which was an area reserved for the dangerous and those who had committed serious crimes. The housing arrangement of this section was composed of single cells, but allowed communication between prisoners. One method of communication between the prisoners was during exercise or 'freeway' periods at which time a single prisoner would be released to exercise in the walkway or freeway running in front of the cell block, which provided an opportunity for communication between the exercising prisoner and other prisoners in the block.

"On February 20, 1979, when Oglesby was initially placed in this block, the Petitioner was not in custody and the crimes for which he was charged had not yet been committed.

"On February 20, 1979, Fitzgerald made a visit to Oglesby at the jail wherein Oglesby 'poured out his soul' to Fitzgerald respecting the injustice of the charges against him and his claim that murder in the first degree with special circumstances was not the proper charge for the crime and he should have been charged with second degree murder or manslaughter. Oglesby also during this visit described the acts for which he was charged and begged

Fitzgerald to assist him by reading the murder book and the coroner's protocol to determine the proper charge. Fitzgerald never informed his department of this confession. It is unclear, but the Referee believes there was a conversation between Fitzgerald and Oglesby in which Fitzgerald indicated there was nothing he could do for Oglesby. There is evidence of a conversation between Fitzgerald and Oglesby on March 6, 1979, which Fitzgerald indicated was a short conversation in which he reiterated he could not do anything for Oglesby.

"Sometime in March, 1979, Petitioner was housed four to five cells from Oglesby in the high power cell block and communication between Petitioner and Oglesby was possible. Communication was possible during freeway time . . . by speaking with a raised voice and through utilizing the plumbing fixtures. (Apparently, the prisoners could use the toilet as an apparatus of communication after it had been pumped dry.)

"Fitzgerald indicates he was not aware except generally of the murder charges filed against Petitioner and was not in any way connected to the investigations. Fitzgerald denies ever requesting Oglesby to interrogate or to obtain any information from Petitioner respecting the murder charges facing Petitioner.

"There is evidence Oglesby communicated with members of the Los Angeles County Sheriff's Department jail unit and probably with Fitzgerald regarding other inmates.

"On May [21],[6] 1979, Fitzgerald received a message from Oglesby stating he wished to see him. The tenor of the message was [that] it was a matter of importance. The substance of the ensuing conversation between Fitzgerald and Oglesby concerned the developing friendship or relationship of Oglesby and Petitioner. This relationship developed as a result of Oglesby's activities as operator of a canteen from his cell. Oglesby told Fitzgerald that in late March or early April 1979, he was conversing with a cell neighbor about the subject of guns and their identification by their projectiles. Petitioner apparently interjected into the conversation and inquired of Oglesby, who was also known as "Gunner," as to whether Oglesby had any information as to the ability of the police to identify a gun by used shotgun shells and pellets. In this conversation or in a later conversation, Oglesby claimed Petitioner told him Petitioner had used a shotgun to kill three of his victims and Petitioner indicated with gestures how he used the shotgun.

---

[6]The referee's report cites the date as May 20. The record, however, reveals that the date was May 21. We have amended the referee's subsequent references to "May 20" to read "May 21."

"During the initial conversations between Petitioner and Oglesby, the Petitioner apparently expressed an interest in the possibility of escape from the State Hospital institutions at Patton and Atascadero and was advised by Oglesby it was general knowledge Atascadero was difficult to escape from and escape from Patton was easier, but very few prisoners were ever sent to Patton. Petitioner additionally, in one of these conversations, confided to Oglesby it was his desire to escape from the Los Angeles County Jail and he was developing a plan of escape and desired Oglesby's advice. The plan consisted of a scheme to escape from the transportation bus as it approached the Torrance courthouse and he (Petitioner) had a drawing depicting the layout of the Torrance courthouse.

"It was these topics of information, the admission of the shooting of the victims and the plan of escape, [that] Oglesby sought to impart to Fitzgerald. Subsequent to receiving this message from Oglesby, on May [21], 1979, he visited the jail and after talking with Oglesby about the above matters, Fitzgerald requested Oglesby bring the documents Oglesby said he obtained from Petitioner to their next visit. On the following day, Oglesby produced the documents of escape and verified they were prepared by Petitioner. During this visit, Oglesby again told Fitzgerald the verbal admission made by Petitioner to Oglesby that Petitioner killed three of the victims with a shotgun.

"Fitzgerald thereafter introduced Oglesby to Sheriff's Department Deputy Allender who, Fitzgerald told Oglesby, would head the investigation of the escape plans. The subsequent escape investigation developed the information through Oglesby that Petitioner planned the escape by blocking the progress of the transportation bus at the sally port of the courthouse with a car containing individuals with guns to kill the two deputies accompanying the bus.

"Allender then continued with the investigation by talking with Oglesby and enlisted Oglesby's help in obtaining further details of the escape plan including prospective dates and accomplices. Oglesby further informed Allender [that] Petitioner inquired of Oglesby whether Petitioner should wait to effect his escape plan until after Petitioner's brother was released from county jail. Petitioner apparently thought Oglesby would be a participant in this escape attempt and Oglesby did not dissuade Petitioner from this surmise. There is testimony that both Allender and Fitzgerald encouraged Oglesby to feign his cooperation in the escape plan in order to gain as much information as possible.

"As a result of the information given by Oglesby to Allender, Allender learned Petitioner solicited the cooperation of his girlfriend in the escape.

Oglesby had suggested to Petitioner that his (Oglesby's) wife contact Petitioner's girlfriend. Mrs. Oglesby was wired by the Sheriff's Department for recording, but the effort was unsuccessful.

"In June 1979, Oglesby became concerned Petitioner was aware he was not a co-conspirator, but something else. The relationship between the two then chilled. The escape plan was inchoate at all times and never went beyond the planning stage. After the initial investigation of the escape plan, Allender became aware the Petitioner was a member of the south central Los Angeles gang known as the Crips. This latter information caused the Sheriff's Department to take extra precautions to prevent the escape of Petitioner."

D. *The referee's response to our questions*

Judge Egly concluded as follows:

"The referee finds in answer to the first question propounded by the Supreme Court that neither the State nor any of its agents employed George Oglesby to elicit any confession or admission that Petitioner killed three of his victims.[7] The confession or admission of the Petitioner was not the result of any actions by the State in derogation of Petitioner's Sixth Amendment rights.

"The referee finds, however, that the State actively solicited, directed and aided the informant, George Oglesby, to obtain through solicitation of Petitioner additional information as to Petitioner's escape plans after the initial disclosure by Oglesby to the Los Angeles County Sheriff's Department on May [21], 1979. All such escape information solicited and unsolicited was used by the State in the Petitioner's trial for murder.

"The Referee answers the second question as follows:

"After the disclosure by the informant, George Oglesby, to the Los Angeles County Sheriff's Department on May [21], 1979, which initial disclosure was not solicited, directed or requested by the State, the State employed Oglesby as its agent to obtain as much information as he could from Petitioner as to the ongoing formation of Petitioner's plan for flight. This information was used by the State and presented at trial of the Petitioner as evidence of guilt."

---

[7] The referee earlier stated: "Petitioner contends [Officer] Fitzgerald had placed Oglesby in the high power section of the Los Angeles County Jail and this was done for the purpose of using him as an informer. The evidence produced by the Petitioner does not meet Petitioner's burden to support this, but raises only a suspicion not to the level of a preponderance of the evidence."

E. *Analysis of referee's findings*

■ " '[A] referee's conclusions of law are subject to independent review, as is his resolution of mixed questions of law and fact. [Citations.] . . . The referee's findings of fact, though not binding on the court, are given great weight when supported by substantial evidence. The deference accorded factual findings derives from the fact that the referee had the opportunity to observe the demeanor of witnesses and their manner of testifying.' (*In re Marquez* (1992) 1 Cal.4th 584, 603 [3 Cal.Rptr.2d 727, 822 P.2d 435]; see also *In re Jackson* (1992) 3 Cal.4th 578, 585 [11 Cal.Rptr.2d 531, 835 P.2d 371]; *In re Cordero* (1988) 46 Cal.3d 161, 180-181 [249 Cal.Rptr. 342, 756 P.2d 1370].)" (*In re Hitchings* (1993) 6 Cal.4th 97, 109 [24 Cal.Rptr.2d 74, 860 P.2d 466].)

Petitioner challenges the referee's first finding, i.e., that *before* May 21, 1979, the police did not enlist Oglesby as an agent to solicit incriminating information from petitioner. This is a mixed finding of fact and law, subject to our independent review. The People, on the other hand, challenge the referee's second finding, i.e., that the information obtained by Oglesby *after* May 21 was secured in violation of petitioner's Sixth Amendment rights. We need initially address only petitioner's challenge to the first finding because, as explained below, if we conclude that the "pre-May 21, 1979, evidence" was not obtained in violation of petitioner's Sixth Amendment rights under *Massiah, supra,* 377 U.S. 201, and its progeny, any such violation that occurred *thereafter* would be harmless beyond a reasonable doubt. Accordingly, we focus on our referee's conclusion that before May 21, 1979, Oglesby did not obtain information in violation of petitioner's Sixth Amendment rights.

Petitioner stresses various facts (set out in our referee's synopsis of his findings, *ante,* at pages 588-593) which, in his view, establish that from the moment Oglesby met petitioner (in early April 1979), Oglesby was a government agent who was used to solicit information from him. He focuses on Oglesby's "longstanding prior working relationship with law enforcement" (and Lieutenant Fitzgerald in particular), and claims the referee erred by finding that Oglesby became an agent of the state only after May 21, 1979. In order to analyze petitioner's contention, we first briefly review the high court cases that underlie petitioner's Sixth Amendment claim.

In *Massiah, supra,* 377 U.S. 201, codefendants were indicted for possession of narcotics. Thereafter one of the defendants decided to cooperate with the government's prosecution of his codefendant (Massiah), by allowing the police to place a radio transmitter in his (the informer's) car. Subsequently,

the informer engaged Massiah in conversation while the police listened by radio. The police testified to the incriminating statements they overheard.

The court found a violation of Massiah's Sixth Amendment right to counsel, and held the statements inadmissible against him at trial. It concluded that once the Sixth Amendment right attaches, a defendant is denied that right when state agents "deliberately elicit" incriminating statements from him in the absence of his counsel. (*Massiah, supra,* 377 U.S. at p. 206 [12 L.Ed.2d at p. 250].)

*Henry, supra,* 447 U.S. 264, involved informant Nichols, a jailmate of Henry, who was charged with bank robbery. Nichols had been a paid confidential informant for the Federal Bureau of Investigation (FBI). An FBI agent told Nichols to be alert to any statements made by prisoners, but not to initiate or engage in any questioning of Henry regarding the bank robbery. After Nichols was released from jail, the agent contacted him and learned that Nichols and Henry had conversed about the bank robbery. The agent paid Nichols for that information, and Nichols testified at Henry's trial.

The court found it significant that "Nichols had been a paid Government informant for more than a year; moreover, the FBI agent was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion." (*Henry, supra,* 447 U.S. at p. 270 [65 L.Ed.2d at p. 122].) The court stated: "Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." (*Id.,* at p. 271 [65 L.Ed.2d at p. 122].) Finally, the court concluded, "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." (*Id.,* at p. 274 [65 L.Ed.2d at p. 125].)

In *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477], the court again found a Sixth Amendment violation. There, an informer, Colson, recorded conversations with his codefendant, Moulton, after Moulton was indicted. In those conversations Moulton raised and rejected a plan to "eliminate" witnesses, and both suggested creation of false alibis (conformed, as closely as possible, to what really happened) as a joint defense to be advanced at trial. In the process, Colson professed an inability to recall the events of their crimes, and he "repeatedly asked Moulton to remind him about the details of what happened." (*Id.,* at p. 166 [88 L.Ed.2d at p. 489].) As a result, Moulton made numerous incriminating statements that were introduced against him at trial. (*Ibid.*)

The *Moulton* court concluded: "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. . . . [T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." (*Maine* v. *Moulton, supra*, 474 U.S. at p. 176 [88 L.Ed.2d at p. 496].)[8]

Significantly, the high court also rejected the government's argument that the intrusion was justified by its need to continue an investigation of suspected ongoing criminal activities, i.e., the "elimination" of state witnesses: "[L]aw enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. . . . Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel." (*Maine* v. *Moulton, supra*, 474 U.S. at pp. 179-180 [88 L.Ed.2d at pp. 498-499], fns. omitted.)

The high court's most recent pronouncement on the issue came in *Kuhlmann* v. *Wilson, supra*, 477 U.S. 436, and this time the court rejected a Sixth Amendment challenge. The facts showed that when the defendant (Wilson) entered his jail cell he met the informer (Lee), and began narrating a story about why he was arrested. (*Id.*, at p. 439 [91 L.Ed.2d at pp. 371-372].)

---

[8]The court acknowledged that "direct proof" of the government's knowledge that an informant would obtain incriminating information in the absence of counsel will seldom be available to an accused. It made clear, however, that a Sixth Amendment violation is stated if the police " 'must have known' " its agent was "likely" to obtain incriminating information from the accused in the absence of counsel. (*Id.*, at p. 176, fn. 12 [88 L.Ed.2d at p. 496].) In this regard, it noted that because of the relationship between Moulton and Colson, Colson's act of engaging Moulton "in active conversation about their upcoming trial was certain to elicit" incriminating statements from Moulton (*id.*, at p. 177, fn. 13 [88 L.Ed.2d at p. 496]), and that Colson's participation in "in this conversation was 'the functional equivalent of interrogation.' " (*Ibid.*)

Although Lee advised Wilson that his story " 'didn't sound too good' " (*id.,* at pp. 439-440 [91 L.Ed.2d at p. 372]), the trial court found, and the high court agreed, that Lee " 'at no time asked any questions with respect to the crime,' and that he 'only listened to [Wilson] and made notes regarding what [Wilson] had to say.' " (*Id.,* at p. 440 [91 L.Ed.2d at p. 373]; see also *id.,* at p. 460 [91 L.Ed.2d at p. 385].)

The court stated: " '[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached,' [citations][.] [A] defendant does not make out a violation of that right simply by showing that an informant, *either through prior arrangement or voluntarily,* reported his incriminating statements to the police. Rather, the defendant must demonstrate that *the police and their informant took some action,* beyond merely listening, *that was designed deliberately to elicit incriminating remarks.*" (*Kuhlmann* v. *Wilson, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at pp. 384-385], italics added.)

The *Kuhlmann* v. *Wilson* court concluded that because the defendant's statements were " 'spontaneous' " and " 'unsolicited' " (*supra,* 477 U.S. at p. 460 [91 L.Ed.2d at p. 385]), the Sixth Amendment did not forbid their admission in evidence even though the jailhouse informant had apparently been deliberately placed near the defendant so that he would be in a position to hear any incriminating statements.[9]

▇▇ Petitioner claims the government should be accountable for Oglesby's conduct prior to May 21, 1979, because, he asserts, the evidence adduced at the hearing established (i) a "prior working relationship" between Oglesby and the police, from which it might be inferred that the police encouraged Oglesby to elicit information from petitioner, and (ii) police conduct that "directly motivated" Oglesby to elicit incriminating information from petitioner. (See *People* v. *Gonzalez, supra,* 51 Cal.3d 1179, 1241.) As we explain, we agree with the referee: Petitioner failed to meet his burden to establish that, *before* May 21, 1979, the police used Oglesby as an agent to elicit incriminating information from petitioner.

▇▇ As an initial matter, we reject petitioner's suggestion that a Sixth Amendment violation is established if only he can show that the police had

---

[9]We have applied these high court decisions in a number of cases. (See, e.g., *People* v. *Gonzalez, supra,* 51 Cal.3d 1179; *People* v. *Whitt* (1984) 36 Cal.3d 724, 742 [205 Cal.Rptr. 810, 685 P.2d 1161]; *In re Wilson* (1992) 3 Cal.4th 945, 950-955 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) Most recently, in *In re Neely* (1993) 6 Cal.4th 901 [26 Cal.Rptr.2d 203, 864 P.2d 474], we granted relief under *Kuhlmann* v. *Wilson, supra,* 477 U.S. 436, in a matter in which our referee found the government arranged for an informant to take deliberate actions designed to elicit incriminating remarks.

a "prior working relationship" with Oglesby. Such evidence may, depending on the circumstances, give rise to an *inference* that the police encouraged the informant to elicit incriminating information (see *People* v. *Gonzalez, supra,* 51 Cal.3d at p. 1241); but it does not, by itself, establish such an agency or illegal directive. In fact, as *Kuhlmann* v. *Wilson, supra,* 477 U.S. 436, makes clear, the Sixth Amendment is not violated simply because the police arrange with an informant to accept information that he obtains (*id.,* at p. 459 [91 L.Ed.2d at p. 384]), and as we made clear in our opinion on the appeal in this case, a general police policy of encouraging inmates to provide useful information does not transform inmates into police agents. (*People* v. *Williams, supra,* 44 Cal.3d at p. 1141.)

 Arguably, the evidence—particularly that concerning Oglesby's assistance and testimony in the Bracero "Mexican Mafia" case—supports a conclusion that Oglesby had a prior working relationship with Fitzgerald before Oglesby was incarcerated on a murder charge. It is far more problematic, however, whether the evidence supports a conclusion that Fitzgerald in particular, or the government in general, sought to "arrange" for Oglesby to "[take] some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann* v. *Wilson, supra,* 477 U.S. at p. 459 [91 L.Ed.2d at p. 385].) Our referee concluded the evidence did not establish that point by a preponderance of the evidence. After independent review of the evidence and our referee's findings, we share our referee's conclusion.

Petitioner asserts the record suggests that Fitzgerald encouraged Oglesby to procure information, and promised that he (Fitzgerald) would pass that information to the district attorney, and likewise advise the district attorney of Oglesby's helpful information given in the past. Petitioner focuses on the following testimony by Fitzgerald at the most recent evidentiary hearing:

"The court: And did you ever in any way indicate to Mr. Oglesby that in some way, he should be given consideration in this [i.e., Oglesby's] case for his testimony in Williams' case?

"The witness: My statement to him has been the same that I've made to many people that wind up in the county jail for one reason or another. 'I will go to the District Attorney with the information you give me. I will make it known to the District Attorney, whatever information you have given me in the past. And that's all I can do.'

"The court: Did you deviate from this practice in the Oglesby-Williams matter?

"The witness: No, sir."

Petitioner asserts this establishes that Fitzgerald "directly motivated" Oglesby *before* May 21, 1979, to elicit incriminating information from petitioner. We cannot agree. Fitzgerald testified he could not remember whether the described conversation occurred before or after May 21, 1979. Our referee made no finding as to when this conversation took place, and petitioner provides us with no evidence that the conversation occurred before May 21, 1979. Accordingly, we reject petitioner's claim that the above quoted testimony "standing alone establishes that Oglesby's elicitations were 'directly motivated' by Fitzgerald."

We must agree with our referee that the record does not establish that *the government* induced Oglesby, prior to May 21, 1979, to elicit incriminating information from petitioner. Accordingly, we conclude that petitioner has not met his initial burden under *Kuhlmann* v. *Wilson, supra,* 477 U.S. at page 459 [91 L.Ed.2d at page 385], and that the pre-May 21, 1979, evidence was not illegally obtained.

### F. *Application of our referee's findings*

■ As we explain below, the pre-May 21, 1979, evidence was the core of Oglesby's testimony. The evidence that was obtained from petitioner after that date consisted merely of the "fine tuning" of the escape plan evidence that was otherwise properly obtained and presented to the jury. Accordingly, we shall conclude that, even assuming (as our referee found) that the post-May 21, 1979, evidence was improperly procured in violation of petitioner's Sixth Amendment rights and should have been excluded at trial (*Nix* v. *Williams* (1984) 467 U.S. 431, 442 [81 L.Ed.2d 377, 386, 104 S.Ct. 2501]), introduction of that evidence was harmless beyond a reasonable doubt, in light of the evidence *properly* obtained before that date. The properly obtained evidence consisted of the following:

### 1. *Evidence linking petitioner to the motel murders*

Soon after petitioner met Oglesby, he engaged him in a conversation about guns and asked specifically whether the police would be able to link shotgun shells to a specific firearm. Later, petitioner told Oglesby that he, "Blackie" (Coward), and two others had held up a motel and that he had shot a man, woman, and their daughter in the motel.

### 2. *Evidence concerning petitioner's escape plan*

Petitioner asked Oglesby about the chances of escape, and Oglesby replied they were "very poor." Later, petitioner said that transfer from the jail to

court and vice versa was the weak link in the custody system. At that time, petitioner drew a detailed map of the court layout, diagrammed his escape plan,[10] and explained his plan to Oglesby. Petitioner was aware that one deputy always exited the bus after it stopped to back into the court area, and he believed that someone could point a gun at and disarm that deputy while another person pulled a car in front of the bus. (Petitioner explained that his friends on the outside would be involved in the escape.) According to petitioner's plan, the person with a gun on the deputy could then obtain keys to the bus cage and arm petitioner and Oglesby. Petitioner said he would then kill a person on the bus (who was set to testify against petitioner in this case), and that he and Oglesby would drive the bus to a nearby point, kill the two deputies, and transfer to a waiting vehicle to complete their escape.

A few days after relating this plan, petitioner told Oglesby he had someone on the outside who could help him. He said he would use, among others, a woman named Lynn, and asked if Oglesby likewise had anyone on the outside who could help. At that point, petitioner handed to Oglesby the map of the courthouse escape plan.

Oglesby told petitioner that Oglesby's wife was the only person he trusted on the outside. Shortly thereafter, petitioner gave Oglesby two additional notes. The first came shortly after Oglesby returned to his cell from the visiting room. Oglesby asked petitioner if the person he had just met in the visiting room was going to help in the escape. In response, petitioner threw Oglesby a note saying that person was "his other woman," not the one who would help for their "mission."[11] The second note was delivered after petitioner returned to his cell from another visit. On May 11, 1979, petitioner gave Oglesby a note saying another woman had a new seven-pump shotgun for petitioner.[12]

On May 21, 1979, Oglesby spoke to Lieutenant Fitzgerald for an hour and a half. Oglesby told Fitzgerald about the escape plan and said he had the map and notes in his cell with his legal papers. Fitzgerald asked petitioner to give him those documents, and they agreed to meet the next day, at which time Oglesby produced the escape map and the two notes.

---

[10]The map depicts the courthouse parking lot and adjacent structures, and labels the surrounding streets. It also shows speed bumps and bushes that surround the area where the bus arrives at the courthouse, and depicts how the bus will back up to the courthouse before unloading its passengers.

[11]The note read: "This time it was my other woman. It wasn't the other one. This one is not the type for our mission. Most definitely not. So until the other one come's. Tookie." (This note, like all of petitioner's other notes, sported asterisk-like stars above each letter "i.")

[12]That note read, "Gunner I had the visit and she said its' cool, as I expected. She has a brand new pump-high standard 7 shoots'. And your $1.35 tomorrow no, ifs', and's, or, buts, cool. But anyway all they have to do is hook up real soon, you know. William's." (On the day he received this note, Oglesby wrote on it: "5-11-79 G.W.O.")

### 3. *Evidence obtained after May 21, 1979*

Against this properly obtained and properly presented evidence, the evidence introduced at trial that Oglesby obtained from petitioner after May 21, 1979, is comparatively less significant and predominantly cumulative. That evidence consisted of (i) testimony that petitioner changed the escape plan to blow up the bus with dynamite in order to dismember all inside it and thereby mask his escape, and (ii) five additional notes in which petitioner refined and revised the plan.[13]

It is true, as petitioner stresses, that the prosecutor addressed the evidence obtained by Oglesby during closing argument at the penalty phase trial. Although the majority of the thirty-page argument focused on the violent and callous nature of petitioner's crimes, the prosecutor made one reference to Oglesby and four references to his testimony. First, the prosecutor reminded the jury that Oglesby had testified that petitioner mentioned he liked to rob "Orientals," because he thought they would usually have money. Next, he recounted how petitioner wrote a note saying that "Blackie," the codefendant who eventually testified against him, was a "heartbeat away" from death. Then the prosecutor turned to the escape plan: "What does the plan show? Not only is the driver of the transportation going to be killed, not only the swamper, the guy in the back of the bus going to be killed; but dynamite is going to be thrown into the bus to disfigure the inmates so that you can't tell who got away. [¶] Could there be any better illustration of the brutality, the cruelty, and the viciousness that is in the system of Stanley Williams than that plan?" Finally, the prosecutor returned to the escape plan: "And, of course, the escape plan is filled with the planning, rather detailed planning, of violence. And this is long after the defendant has already killed four people and is in County Jail and is still making the same kinds of plans involving the same kinds of violence to benefit only one person in society. That person is Stanley Williams."

It is also true, as petitioner observes, that in this argument the prosecutor referred to some of the evidence obtained after May 21, 1979—i.e., petitioner's revised plan to blow up the transport bus with dynamite, and his threat

---

[13]One note, labeled exhibit C at the initial evidentiary hearing, asked if "Mrs. Couch" had arranged to obtain additional weapons. Exhibit D asked whether to wait for a court appearance before attempting to escape, or to precipitate a trip to the county hospital to hasten an escape attempt. Exhibit E disclosed that petitioner's brother had been sentenced to three months in the county jail and asked whether to delay the escape until after his brother's release in order to obtain his brother's assistance. In exhibit F, petitioner claimed to have dynamite for the escape. Finally, in a second part of exhibit C, petitioner wrote that his accomplice, "Blackie" Coward, whom petitioner suspected had turned against him, was "a heartbeat away from death waiting for an interruption. I'm it."

to kill "Blackie" Coward, whom petitioner suspected of turning against him and cooperating with the police.[14] But, as noted above, this evidence played a relatively minor role in the prosecutor's penalty phase argument, and in any event, the *essence* of the escape plan evidence, and the fact that defendant made incriminating statements linking himself to the underlying murders, were properly before the jury. The jury was properly informed through various witnesses other than Oglesby that petitioner had made incriminating statements about both the convenience store murder and the motel murders, and it properly learned, through the pre-May 21, 1979, evidence obtained by Oglesby, that petitioner had developed a sophisticated and violent escape plan. Moreover, the jury was properly aware of the map and the initial two notes concerning the escape plan.

Given this, and in view of the other aggravating evidence that was properly before the jury—including petitioner's bragging admissions to Coward, James Garrett, and Esther Garrett (as well as to Oglesby), and his laughing portrayal of the sounds the convenience store victim made while dying—we can confidently say that the jury would have returned the same verdict of death in the absence of the evidence obtained after May 21, 1979. In other words, we conclude, beyond a reasonable doubt, that *assuming* the escape plan evidence obtained after May 21, 1979, was procured and presented in violation of petitioner's Sixth Amendment rights under *Kuhlmann* v. *Wilson, supra*, 477 U.S. 436, any such error did not affect the jury's penalty decision in this case. (See also *post*, p. 612, fn. 24.)

## G. *Challenges to the fairness of the evidentiary hearing*

Petitioner asserts he was denied a "full and fair" evidentiary hearing because, he claims, the government (i) interfered with his right to compulsory process for obtaining witnesses, and (ii) thereafter improperly denied those witnesses immunity. As will appear, we reject these claims.

### 1. *Interference with petitioner's right to compulsory process for obtaining witnesses*

■ Petitioner asserts the People impermissibly interfered with his rights under the Sixth Amendment of the federal Constitution ("In all criminal prosecutions, the accused shall . . . have compulsory process for obtaining witnesses in his favor . . . ."), and article I, section 15, of the California Constitution ("The defendant in a criminal cause has the right to . . . compel attendance of witnesses in the defendant's behalf . . . .").

---

[14]Although the record is unclear on this point, evidence of petitioner's stated preference for robbing "Orientals" may have been obtained after May 21, 1979.

Specifically, he asserts the prosecution unconstitutionally prevented six of his inmate witnesses—George Oglesby, Leslie White, Sidney Storch, Ferril Mickens, Larry Montez, and Steven Cisneros—from testifying on his behalf.

The People dispute whether the compulsory process right, which plainly attaches at trial in a criminal proceeding, also applies in a habeas corpus evidentiary hearing. Assuming, however, that the right applies, we discern no violation here.

■ "A defendant's constitutional rights to compel the attendance of witnesses, as guaranteed by the Sixth Amendment, and to due process, as guaranteed by the Fourteenth Amendment, are violated when the prosecution interferes with the defendant's right to present witnesses. (*In re Martin* (1987) 44 Cal.3d 1, 29-30 [241 Cal.Rptr. 263, 744 P.2d 374].)" (*People* v. *Mincey* (1992) 2 Cal.4th 408, 460 [6 Cal.Rptr.2d 822, 827 P.2d 388], hereafter *Mincey*.) To establish a violation, the claimant bears the burden of showing three elements:

First, he must demonstrate prosecutorial misconduct, i.e., conduct that was "entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify." (*Mincey, supra*, 2 Cal.4th at p. 460; see also *In re Martin* (1987) 44 Cal.3d 1, 31 [241 Cal.Rptr. 263, 744 P.2d 374].)

Second, he must "establish interference, that is, a causal link between the prosecutorial misconduct and the defendant's inability to present the witness." (*Mincey, supra*, 2 Cal.4th at p. 460; see also *In re Martin, supra*, 44 Cal.3d at p. 31.) In this regard, the claimant is "not required to prove that the conduct under challenge was the 'direct or exclusive' cause. [Citations.] Rather, he need only show that the conduct was a substantial cause. [Citations.] The misconduct in question may be deemed a substantial cause when, for example, it carries significant coercive force [citation] and is soon followed by the witness's refusal to testify [citation]." (*In re Martin, supra*, 44 Cal.3d at p. 31.)

Finally, the claimant must demonstrate "materiality." "To carry his burden under federal law, 'he must at least make some plausible showing of how [the] testimony [of the witness] would have been both material and favorable to his defense.' [Citation.] Under California law he must show at least a reasonable possibility that the witness could have given testimony that would have been both material and favorable. [Citations.]" (*In re Martin, supra*, 44 Cal.3d at p. 32.)

We will test petitioner's claims, as to each prospective witness, against the three-part test set out above.

### a. *George Oglesby*

As noted above, Oglesby died of a heart attack one day before the evidentiary hearing was scheduled to begin.[15] The record establishes that he had been treated for a heart condition for years. Documents appended by the People to their postevidentiary-hearing briefs in this court, and not objected to by petitioner, disclose that the prison authorities transported Oglesby to a medical center soon after he complained of chest pains, and that the county coroner "observed no trauma associated with his death."

Petitioner suggests the prosecutor committed misconduct by arranging to transport Oglesby to the hearing in the same bus with petitioner, and that Oglesby was literally scared to death by this prospect. (Both the record, and various exhibits appended to the briefs in this court, suggest petitioner is a strong, muscular man who is a member of the "Crips" street gang, and the "Black Guerilla Family," a prison gang.) As the People observe, however (again, by reference to documents appended to their post-evidentiary-hearing briefs in this court, and not objected to by petitioner), they were most solicitous of Oglesby's safety, and obtained from our referee a protective order regarding transportation and housing of Oglesby. The order expressly noted that Oglesby, who was then housed in Soledad State Prison, was "in significant danger as a result of information and testimony provided against members of the Mexican Mafia, Aryan Brotherhood, and Hoover Crips," and that Oglesby had been in protective custody since 1981. The order concluded it was "necessary to effect a protective keep away order so that the witness does not mingle with any other prisoners or gang members, particularly *defendant Stanley Williams . . . .*" (Italics in original.) Finally, the order specified that Oglesby's "heart medicine" be "made available to him on a regular basis."[16]

We conclude petitioner has failed to show any misconduct on the part of the prosecutor that contributed to Oglesby's "refusal" (i.e., failure) to testify.

---

[15]Petitioner claims Oglesby would have testified that he (Oglesby) regularly employed illegal techniques to gather information against fellow inmates, and that he worked with Lieutenant Fitzgerald as an informant. Petitioner also asserts Oglesby would have testified about the "pattern and practice" employed by the Sheriff's Department in its alleged "misuse" and "misplacement" of informants in the Los Angeles County jail. Specifically, petitioner claims Oglesby would have testified he was given police reports by Sheriff's Deputies Lopez and Reid, in order to assist his information gathering practices. Petitioner asserts: "Oglesby's use of these police reports to elicit and manufacture admissions or confessions based on the information contained in the reports establishes that Oglesby acted in the same manner that [petitioner] alleges Oglesby acted when he elicited or manufactured evidence against [petitioner]."

[16]Additional documents appended to the People's brief assert, by way of declarations, that over a week before the scheduled hearing, the protective order was delivered to prison and jail personnel, with directions that a copy be given to Oglesby "to be kept on his person."

As the People observed at the evidentiary hearing, the intervention came from a higher authority.

### b. *Leslie White*

■ As noted above, the allegations in petitioner's habeas corpus petition were largely supported by transcripts of tape recordings and declarations of Leslie White.[17] Petitioner notes that on March 3, 1992—two days before the rescheduled evidentiary hearing was set to begin—the Attorney General indicted and arrested White, apparently for perjury in past cases. One week later, after petitioner called White as a witness on his behalf, White invoked his Fifth Amendment right against self-incrimination and declined to testify. Petitioner asserts the timing of the government's indictment and arrest transformed White from a willing witness to one who refused to testify, and hence constituted misconduct as defined in *In re Martin, supra,* 44 Cal.3d 1, 31.

Once again, documents appended as exhibits to the People's briefs, and not objected to by petitioner, disprove petitioner's theory. The exhibits include the following:

(i) An April 18, 1991, memorandum (and contemporaneous handwritten notes) by Deputy Attorney General Preminger. The memorandum states that on April 9, 1991, Leslie White and George Oglesby telephoned Preminger. According to the memorandum, Oglesby stated he feared his life would be endangered if he testified, and asked that he be given protective custody during the hearing. White stated that his 1989 declaration (in which he asserted that Oglesby told him Oglesby had lied in petitioner's case) was itself a lie, and that insofar as he knew, Oglesby had indeed told the truth in petitioner's case.

(ii) An August 1, 1992, handwritten letter from Leslie White to "Mr. Price" (one of petitioner's attorneys), informing him that White would invoke his Fifth Amendment right against self-incrimination and decline to testify in petitioner's evidentiary hearing. The letter stated: "Further, I'm not sure if I've ever told the truth regarding the *Williams* case or Oglesby—I can't recall, as the cops say . . . ." It continued: "I will not testify. If you bring me down I'll plead the 5th AFTER I tell about *why* I signed your.

---

[17]Petitioner asserts White would have testified consistently with his 1979 tape recording and his 1989 declaration.

declaration. It won't be pretty. Leslie White." (Italics and capitalization in original.)[18]

(iii) A March 17, 1992, declaration by Deputy District Attorney Martin, recounting that on February 6, 1992, Leslie White telephoned him after he was served with a subpoena to testify at the evidentiary hearing by the People. According to Martin, White said his 1989 declaration was untrue. White claimed he signed the declaration while he was in county jail, and feared for his life. Moreover, White asserted, he was told by petitioner's counsel that the declaration would lead to his transfer to federal custody. White asserted he would testify at petitioner's hearing that his own 1989 declaration was a lie.

We conclude, based on the hearing record and the above described exhibits, that petitioner has failed to show the indictment and arrest of Leslie White shortly before he was scheduled to testify for petitioner constitutes "misconduct" as defined in *In re Martin, supra*, 44 Cal.3d at page 31. Petitioner cannot show that the government's conduct was wholly unnecessary to the performance of its duties and was of such a character as to transform White from a willing witness to one who refused to testify.

### c. *Sidney Storch*

█ Storch was indicted in April 1991, apparently for perjury.[19] Petitioner asserts the People indicted Storch in order to intimidate him and prevent him from testifying. Exhibits appended to the People's briefs (and not objected to by petitioner), however, show that the People were not apprised that Storch was a possible witness until eight months *after* his indictment, when his name appeared, buried among one hundred and one other names in a list of petitioner's possible witnesses. Given this, it is difficult to discern in what way the prosecutor might have committed "misconduct" as that term is used in *In re Martin, supra*, 44 Cal.3d at page 31.

In any event, the record reveals that petitioner's counsel, and not the People, are ultimately responsible for Storch's failure to testify. The record shows that Storch was in custody out of state, and was fighting extradition on his indictment. Petitioner's counsel failed to subpoena Storch (see Pen. Code, §§ 1334.4-1334.6 [Uniform Act to Secure the Attendance of Witnesses From Without the State in Criminal Cases]). His attempt to now blame the People for Storch's absence at the hearing is wholly unpersuasive.

---

[18]The letter contains a postscript: "Nothing personal—Just want it all behind me."

[19]Petitioner does not reveal the testimony he expected Storch would have given at the hearing.

### d. *Ferril Mickens, Larry Montez, and Steven Cisneros*

■ All three of these witnesses were serving substantial prison terms at the time they were subpoenaed by petitioner to testify at his evidentiary hearing. Each, when called to the stand, invoked his Fifth Amendment right against self-incrimination, and refused to testify.[20] Petitioner asserts that each was intimidated by the prospect that the People, who had indicted White one week earlier (and Storch over eight months earlier), might also indict him for perjury, in violation of his rights under *In re Martin, supra,* 44 Cal.3d at page 31.

Again, petitioner has not established misconduct. As noted above, there is no evidence that the indictments were unnecessary to the performance of the prosecution's duties. Accordingly, we again reject petitioner's claim. In any event, for the reasons set out below, it appears unlikely petitioner can prove the second element of his claim, namely, that the government's conduct was a substantial cause of his witnesses's failure to testify.

(i) *Mickens.* Petitioner offers only conjecture to support his claim that the government's indictments were a substantial cause of Mickens's refusal to testify. The record and supporting exhibits, however, suggest the following:

Petitioner's counsel interviewed Mickens while he was in prison, concerning "informant practices in the Los Angeles County Jail," and Mickens apparently offered information helpful to petitioner's case. It appears, however, that petitioner's attorneys failed to disclose the identify of their client. Thereafter, Mickens was transported (without a protective order) to the Los Angeles County jail, in preparation for his testimony at the evidentiary hearing.

At the hearing, Mickens invoked his Fifth Amendment right not to incriminate himself. He thereafter explained on cross-examination by the People that after his arrival at the Los Angeles County jail, he telephoned Sergeant Mattson of the Los Angeles Police Department (whom he knew through his sister). Mickens said he told Mattson he feared for his life because he had been transported without protective custody, and because he "found out who the defendant was in this case." Immediately thereafter, the prosecutor asked, "Now, are you taking the Fifth Amendment because you

---

[20]Petitioner asserts that all three would have testified in essence "regarding illegal acts committed in or around 1979 by Oglesby, [Leslie] White and various Los Angeles County Sheriff's deputies and prosecutors." He further asserts, "Cisneros was also prepared to testify regarding threats made against him by Los Angeles law enforcement officials if he exposed the illegal acts of informants, including those committed by Leslie White. [Citation.]"

feel you would incriminate yourself, or because you feel that you're intimidated?" Mickens responded, "Both."

In a declaration attached to the People's brief (and not objected to by petitioner), Sergeant Mattson states he visited Mickens at the Hall of Justice, at which time Mickens told him he had been "brought to Los Angeles to testify in a case involving a prominent member of the BGF [Black Guerilla Family, a prison gang] by the name of Williams." The declaration asserts, "Mickens said he had not volunteered to testify but that another inmate at Soledad had supplied his name." He claimed fear "for his life and the lives of his sister and father if he testified in the case," and said that he planned to assert his Fifth Amendment privilege. Finally, he stated that on March 3, 1992 (the date originally set for the start of the hearing), one of petitioner's attorneys visited him. The declaration reports that when Mickens made it clear he would not testify, the attorney started to leave, and told Mickens: "I'm going down to see Williams and I'll give him your regards." The declaration concludes: "Mickens said this remark by the attorney terrified him because it implied bodily harm would come to him or his family."

We question whether, on this record, the prosecution's indictment of White and Storch was a "substantial cause" of Mickens's failure to testify. It appears instead that Mickens's fear for his and his family's safety—a fear of petitioner and his counsel, not the People—was the primary cause of Mickens's refusal to testify. Although we may assume that Mickens also considered the prospect that his testimony might, if false, result in an indictment for perjury, that prospect cannot, as a matter of law, support a claim of improper interference with petitioner's Sixth Amendment right of compulsory process. Nor are we willing to assume that Mickens could reasonably have believed that his truthful testimony would result in a perjury prosecution. Accordingly, we conclude that whatever the effect of the indictments for perjury of White and Storch, that effect was insubstantial insofar as it concerned Mickens's refusal to testify.

(ii) *Montez.* As with Mickens, petitioner apparently failed to secure a protective order for Montez's transportation to and housing during the evidentiary hearing. And, like Mickens, on cross-examination Montez admitted he wished to invoke his Fifth Amendment rights for two reasons: He believed the answers would incriminate him, *and* he felt intimidated by petitioner. Again, for many of the reasons set out above in our discussion of Mickens, we conclude that whatever the effect of the indictments for perjury of White and Storch, that effect was insubstantial insofar as it concerned Montez's refusal to testify.

(iii) *Cisneros.* Finally, as to Cisneros, we again doubt that petitioner has proved the second element of his claim, namely, that the government's

conduct was a substantial cause of Cisneros's failure to testify. Again, it appears petitioner failed to secure a protective order for Cisneros's transportation to and housing during the evidentiary hearing, and that this contributed substantially to the witness's refusal to testify. Although Cisneros refused to elaborate at the evidentiary hearing concerning why he invoked his Fifth Amendment right, his declaration, signed about two weeks earlier (and appended, without objection, to petitioner's brief) asserts he planned to invoke his Fifth Amendment right for two reasons: First, "as a result of the indictment and arrest of Sidney Storch and Leslie White, I am now unwilling to testify at petitioner's evidentiary hearing for fear that I will be indicted if I provide testimony helpful to Petitioner. *I am further fearful for my safety should I be transported to and housed in the Los Angeles County jail system.*" (Italics added.)

Moreover, although we may assume that Cisneros considered the prospect that his testimony might, if false, result in an indictment for perjury, as noted above, that prospect cannot, as a matter of law, support a claim of improper interference with petitioner's Sixth Amendment right of compulsory process. Nor are we willing to assume that Cisneros could reasonably have believed that his truthful testimony would result in a perjury prosecution. Accordingly, we conclude that whatever the effect of the indictments for perjury of White and Storch, that effect was insubstantial insofar as it concerned Cisneros's refusal to testify.

## 2. *Denial of immunity for petitioner's witnesses*

Petitioner insists that in light of his witnesses' invocation of their Fifth Amendment rights, either the prosecution, or the court, had an obligation to grant his witnesses immunity sufficient to allow them to testify at the hearing.

Petitioner's claim of a right to compulsory prosecutorial immunity for his witnesses is easily rejected. Petitioner has no such right. (*In re Weber* (1974) 11 Cal.3d 703, 720 [114 Cal.Rptr. 429, 523 P.2d 229]; *People* v. *St. Joseph* (1990) 226 Cal.App.3d 289, 298-299 [276 Cal.Rptr. 498], and cases cited; *People* v. *DeFreitas* (1983) 140 Cal.App.3d 835, 838-841 [189 Cal.Rptr. 814], and cases cited.) As these cases disclose, although the prosecution has a statutory right, incident to its charging authority, to grant immunity and thereby compel testimony (Pen. Code, § 1324), California cases have uniformly rejected claims that a criminal defendant has the same power to compel testimony by forcing the prosecution to grant immunity.

Petitioner insists, nevertheless, that the court—in this matter, our referee —had inherent power to grant his witnesses whatever immunity might be

necessary to compel their testimony. He relies on *People v. Hunter* (1989) 49 Cal.3d 957, 972 et seq. [264 Cal.Rptr. 367, 782 P.2d 608], in which we *declined to decide* whether "in appropriate circumstances an essential witness for a criminal defendant should be granted judicial use immunity" (p. 975), but concluded that, even if available, such immunity was not required in that case.

As *Hunter, supra,* makes clear, the vast majority of cases, in this state and in other jurisdictions, reject the notion that a trial court has "inherent power" to confer immunity on a witness called by the defense. We noted and discussed the "one case which has clearly recognized such a right, *Government of Virgin Islands* v. *Smith* (3d Cir. 1980) 615 F.2d 964," and concluded that even under *Smith,* the defendant's offer of proof "fell well short of the standards set forth" in that case. (*People* v. *Hunter, supra,* 49 Cal.3d at p. 974.) We reach the same conclusion, by the same reasoning, in this case.

As we explained in *Hunter, supra,* although the Smith court recognized the possibility of judicially conferred immunity in special cases, it "also recognized that 'the opportunities for judicial use of this immunity power must be clearly limited; . . . the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity . . . . [¶] [T]he defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or it is found to relate only to the credibility of the government's witnesses.' ([*Virgin Islands* v. *Smith, supra,* 615 F.2d] at p. 972.)" (*People* v. *Hunter, supra,* 49 Cal.3d at p. 974.)

In *Hunter,* we concluded the proffered testimony failed to meet Smith's first two requirements, because it was not " 'clearly exculpatory and essential' " to his defense. (49 Cal.3d at p. 974.) We reach the same conclusion here: Petitioner does not explain how his witnesses' testimony might meet that stringent requirement; in fact, as suggested above, it is unclear whether his witnesses' testimony would have been favorable to petitioner.[21]

---

[21]In a similar vein, we also reject petitioner's assertion that judicially initiated immunity was required because the prosecution refused to grant his witnesses immunity in an alleged effort to distort the judicial fact-finding process. Assuming a trial court has authority to grant immunity in such cases (see *People* v. *Hunter, supra,* 49 Cal.3d at pp. 974-975), as suggested above, petitioner has failed to establish any such government misconduct in this case.

## H. *Other claims*

██ As noted above, the habeas corpus petition filed in this court raised additional claims not encompassed in our order to show cause. Accordingly, "we thus implicitly determined that [those claims] failed to state a prima facie case" for relief on habeas corpus. (*People* v. *Gonzalez, supra*, 51 Cal.3d at p. 1240.) As in *Gonzalez, supra*, we briefly explain that conclusion here.

### 1. *Improper withholding of evidence*

Petitioner asserts the prosecution, at both the original trial and at the first evidentiary hearing, improperly withheld material evidence in its possession tending to discredit Oglesby's veracity. (*Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]; *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132] [the People have a due process duty "even in the absence of a request therefor, to disclose all substantial material evidence favorable to an accused, whether such evidence relates directly to the question of guilt . . . or to the credibility of a material witness"], italics omitted.) Specifically, he asserts the prosecution failed to disclose to him (i) the 1978 tape recording of a conversation between Oglesby and Leslie White (described *ante*, pp. 585-586); (ii) the 1979 tape recording of an interview of Leslie White by internal affairs investigators of the Los Angeles District Attorney's Office (described *ante*, pp. 585-586); and (iii) a 1988 district attorney's office internal memorandum.[22]

We declined to issue an order to show cause on this claim. As to the latter item, there was no *Brady* violation because the document did not exist at the time of trial or the first evidentiary hearing. More important, as to all of the items, we concluded that assuming there was a *Brady* violation, it was harmless. (*United States* v. *Bagley* (1985) 473 U.S. 667 [87 L.Ed.2d 481, 105 S.Ct. 3375].)

Under *Bagley, supra*, a *Brady* violation requires reversal only if the withheld evidence is "material." "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States* v. *Bagley, supra*, 473 U.S. at p. 682 [87 L.Ed.2d at p. 494].)

---

[22]The memorandum notes that a deputy district attorney (Dennis Choate) declined to use Oglesby in an unrelated murder case because he (Choate) distrusted Oglesby, and believed Oglesby had taught Leslie White "the business of being a jailhouse informant."

We declined to issue an order to show cause on the *Brady* claim because we were convinced that the challenged evidence (which would have been used primarily to impeach Oglesby) was immaterial under *Bagley, supra*: It is not reasonably probable that, had the evidence been disclosed to the defense, the result of the trial would have been different.[23] For those same reasons, we conclude that petitioner's *Brady* claim does not warrant relief on habeas corpus.

## 2. *False evidence*

Petitioner alleges Oglesby's testimony was false, and the prosecution knowingly used this false testimony. His claim is based on Leslie White's October 1989 declaration which, according to a deputy district attorney's declaration noted *ante*, page 606, was subsequently recanted by White, who in turn refused to testify at the evidentiary hearing. We declined to issue an order to show cause on this claim because we were not convinced that petitioner had established a prima facie case of false testimony. In view of White's recantation, our assessment appears to have been correct. We conclude that petitioner's false evidence claim does not warrant relief on habeas corpus.[24]

### Conclusion

Our order to show cause is discharged. The petition for a writ of habeas corpus is denied.

Kennard, J., Arabian, J., Baxter, J., George, J., and Lillie, J.,* concurred.

**MOSK, J.**—I concur in the judgment.

After examining his petition for writ of habeas corpus, I was of the view that petitioner had raised a substantial claim under the Sixth Amendment to the United States Constitution as construed in *Massiah* v. *United States*

---

[23]Petitioner's claim that a *Brady* violation infected his initial evidentiary hearing has been rendered moot by our grant of a second evidentiary hearing at which petitioner was free to introduce and use the allegedly withheld evidence.

[24]Finally, as noted above, we declined to issue an order to show cause regarding petitioner's allegation concerning the purported Sixth Amendment violation discussed *ante*, insofar as that claimed violation affected the guilt judgment and special circumstance findings. We concluded then, and reaffirm now, that in light of the properly admitted evidence at trial, any such error could not possibly have affected the guilt judgment or the special circumstance findings. Accordingly, we conclude that petitioner's Sixth Amendment claim does not warrant relief from the guilt judgment and special circumstance findings.

*Presiding Justice, Court of Appeal, Second Appellate District, Division Seven, assigned by the Acting Chairperson of the Judicial Council.

(1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], and its progeny. Certainly, he had effectively alleged unconstitutional conduct by the government and the most unscrupulous of its agents—jailhouse informants.

But considering all the evidence introduced at the hearing before our referee, I conclude that petitioner has failed to carry his burden of proof. I cannot condone what was done by law enforcement officials in this case. I am nevertheless compelled to return a Scotch verdict: Petitioner has not established entitlement to relief.

Petitioner's application for a rehearing was denied June 22, 1994.