Filed 12/31/14  P. v. Olachea CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ALEX MICHAEL OLACHEA,<br><br>        Defendant and Appellant. | A137246<br><br>(Alameda County<br>Super. Ct. No. H52187) |

Defendant Alex Michael Olachea was convicted of murder and attempted murder on the basis of two separate shootings within a week of each other.  Defendant was placed at the scene of both shootings by a tracking device he was wearing as a condition of parole.  In connection with the first, the victim, who survived, identified defendant as the shooter.  In connection with the second, defendant's girlfriend told two other people that he shot the victim in her presence.  Defendant contends, among other arguments, that the prior inconsistent statement of one witness, a friend of his girlfriend, should not have been admitted to impeach the friend's trial testimony because it was coerced by the police, and the defense was prejudiced by the failure of the prosecution timely to disclose evidence.  We affirm.

# I. BACKGROUND[1]

Defendant was charged, in an information filed May 24, 2012, with one count each of murder (Pen. Code,[2] § 187, subd. (a)) and attempted murder (§§ 187, subd. (a), 664, subd. (a)), and two counts of possession of a firearm by a felon (§ 12021, subd. (a)(1)). As to the charges of murder and attempted murder, it was alleged defendant personally discharged a firearm and caused great bodily injury. (§§ 12022.5, subd. (a), 12022.7, subd. (a)), 12022.53, subds. (b), (c), (d), (g).) The information also alleged four prior felony convictions and two prior prison terms. (§ 667.5, subd. (b).)

## A. *The Olson Shooting*

Mitchell Olson testified that defendant shot him three times in the chest while they were outside Olson's apartment. The two had known each other since they were children, but they had a falling out a few months before, when Olson accused defendant's girlfriend of stealing from him. Olson also believed the girlfriend told defendant Olson had "robbed her." When defendant shot Olson, he said, "[This is] for robbing my old lady" and "I just want to let you know who killed you."

At the time of the shooting, on November 20, 2011, defendant was wearing a GPS tracking device as a condition of his parole, and the tracking device placed defendant within 100 feet of the site of the shooting at the relevant time. Retracing defendant's movements after the shooting using data from the tracking device, police found a sweatshirt with defendant's DNA and gunshot residue on the right sleeve in a field. The sweatshirt matched a description of the clothing worn by defendant at the time of the shooting.

Defendant presented the testimony of Amber Shaw, who was at Olson's apartment that day. She said the incident began after she stole drugs from Richard McDonald, who showed up outside Olson's apartment with a man named "Popeye" and confronted Shaw

---

[1] In this section, we provide only a summary of the evidence at trial. Details are provided as necessary in connection with the discussion of the individual issues raised on appeal.

[2] All statutory references are to the Penal Code.

about the theft.  Olson warned them off, and an argument ensued.  Shaw retreated inside the apartment and heard shots fired.  Before leaving, Shaw testified, she saw defendant, standing off to the side, "watching everything go down," and another man whom she could not identify.  This man's face was hidden by a hoodie, and he was pacing.  At one point during the confrontation, the unidentified man passed near Shaw and said, "Bitch."  After the shooting, Shaw waited for a bit and looked outside.  She saw Olson, but McDonald, Popeye, defendant, and the unidentified man were gone.

Shaw was impeached with the video recording of a police interview soon after the shooting.  During the interview, she had identified only one person as accompanying McDonald and Popeye.  That person was wearing a dark hoodie and said to her, "Where the fuck are you going, bitch."  Immediately after the shooting, Olson told Shaw he was shot by "Alex," and she assumed the third person was Alex.

**B.  *The Casias Killing***

Tina Gomes testified defendant, his girlfriend, Christina Dias, and another couple were visiting her home on the night of November 26.  Gomes gave the other couple a ride home shortly after midnight, leaving defendant and Dias in her home for over an hour.  When Gomes returned, those two were gone, but she found Ryan Casias lying on the kitchen floor, unresponsive.  Gomes assumed Casias was drunk, and she asked a friend to drag him into a spare room with a futon bed.  The next day, Gomes ran into defendant and Dias, and defendant asked Gomes for the keys to her house, which she gave him.  Defendant's tracking device records confirmed he was at Gomes's house the night of the 26th, leaving at 1:30 a.m. on the 27th.

On the morning of November 29, firefighters responding to a fire at Gomes's house discovered Casias's body.  Investigators concluded the fire originated with the futon on which Casias's body was placed.  Although Casias's body was badly burned, the coroner's office concluded he died prior to the fire from a gunshot to the back.  The condition of the body was consistent with the conclusion Casias died around the time he was discovered by Gomes.

3

JoAnn White, a long-time "best friend" of Dias, was called to testify. Although White claimed no memory of talking to Dias the night of November 26–27, telephone records showed she had spoken twice with Dias early that morning. During the investigation of Casias's death, White had told police that Dias told her defendant had shot a man in her presence that night. Another acquaintance of Dias, Joyce Lopez, testified Dias had told her a similar story while they were shopping together. David Jackson, who picked defendant up early that morning, testified defendant said he had "stuck someone" that night and displayed a revolver.

Defendant was convicted of second degree murder, attempted murder, and two counts of weapons possession, and the enhancement allegations were found true. He was sentenced to several consecutive life terms.

## II. DISCUSSION

Defendant contends the trial court (1) erred in admitting White's prior statements to police to impeach her testimony because they were coerced; (2) improperly permitted the prosecution to ambush the defense with undisclosed information regarding Shaw's testimony; (3) erred in refusing to grant use immunity to permit McDonald to testify; (4) erred in failing to give a jailhouse informant instruction in connection with Olson's testimony; and (5) gave a "one-sided" instruction on flight. In a supplemental brief, defendant also argues he was deprived of his right to counsel and due process when Olson confronted him in front of the jury while the trial court conducted an in camera hearing.

### A. *White's Statements to Police*

Defendant first contends the video recording of White's statements to police should have been excluded because they were not voluntarily made.

Police interviewed White at the police station 10 days after the fire. The interview began at approximately 9:00 p.m. Earlier in the day, White had undergone an abortion, for which she was "put under," and she was taking pain medication at the time of the interview. At the outset, White told the officers about the abortion, but she did not

4

complain of pain or discomfort, nor did she display distress.[3] On the contrary, despite the late hour, White appeared alert, in good humor, and responsive.

White initially refused to say anything about Dias, even denying knowledge of her name. The officers falsely told White that Dias had described to them her conversations with White on the night of the Casias killing. They said they merely wanted White to confirm Dias's story. The officers never suggested to White what Dias had told them, other than something "bad" happened that night and Dias was "scared" and needed "someone to lean on big time."[4] When White denied recent contact with Dias, the officers told her they needed to make sure Dias was cleared from involvement. They urged White to "help" Dias. In explanation, the officers suggested that when two or more people are in the room during a homicide, all can "possibly" become defendants in a criminal prosecution. For about half an hour, as White resisted telling them about Dias, the officers returned again and again to these themes, urging White to help Dias by confirming her story. Forty-five minutes into the interview, White gradually began to cooperate, eventually telling the officers, after an hour, that defendant shot someone in front of Dias.

After further discussion, during which White seemed partially to retract her story, the officers took a 15-minute break. White left the room during part of the break. When she returned with one of the officers, White apologized, telling him, "I don't mean to be . . . withholding anything. . . . It's just the way I was brought up. . . ." Apparently the officers allowed White to see Dias in police custody during the break, because she told them, "If I would have seen her sitting in there, . . . I would have told you all a long time ago." White then told the officers, in a relaxed manner, that Dias was in the bedroom at Gomes's house, getting ready to go to bed, when defendant told her "such and such" had

---

[3] The appellate record does not contain a transcript of White's police interview. This summary is taken from our own viewing of the video recording of the interview.

[4] At one point, in response to a question from White, the officers specifically refused to tell her what Dias had told them, noting it would "contaminate" White's statement.

5

arrived and he wanted her to play dice with them.  In the middle of the game, Dias told White, defendant shot the man.  Frightened, Dias gathered her things and left.  She did not even know the victim.  At the end of the interview, White apologized again for not speaking freely earlier in the interview, explaining "all I needed to do was see [Dias]." The entire interview, including the break, lasted an hour and 45 minutes.[5]

Prior to trial, defendant moved to exclude evidence of White's statements.  After reviewing the recordings, the court said the interview did not "involve[] tactics or interactions that rose to a coercive level," but it reserved a final ruling until White testified at trial.  At trial, when White denied having discussed the killing with Dias, she was impeached with excerpts from the interview recording.  White explained she lied to police because she was jealous of defendant's relationship with Dias.

A criminal defendant has standing to prevent the use of involuntary third party statements at trial.  (*People v. Badgett* (1995) 10 Cal.4th 330, 344.)  In those circumstances, the defendant bears the burden of demonstrating coercion.  (*Ibid.*)  " ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' " ' " (*People v. Duff* (2014) 58 Cal.4th 527, 555–556.)  This occurs if the speaker's decision to speak " ' "was not 'essentially free' because his [or her] will was overborne." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.)  Coercive police activity is a necessary predicate for a finding of involuntariness, but it does not alone compel a finding that a resulting statement was coerced.  (*People v. Hensley* (2014) 59 Cal.4th 788, 812.)  "In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including ' " 'the crucial element

---

[5] Defendant contends White repeatedly asked to speak with her lawyer and was denied, but the video recording does not support the claim.  White did not mention a lawyer until 40 minutes into the interview.  At that point, in order to avoid telling the officers directly about her conversations with Dias, White suggested that she could tell her lawyer and direct the lawyer relay the story to police.  The officers disregarded the suggestion, telling White she did not need a lawyer because she was not implicated in the crime.  There is no indication White ever sought a lawyer out of concern for her own legal interests.

of police coercion,' " ' the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health." (*People v. Duff,* at pp. 555–556.) Deception is an accepted part of police interrogation and "does not invalidate a [statement] as involuntary unless the deception is the type likely to procure an untrue statement." (*People v. McCurdy*, at p. 1088.) We review the record de novo to determine whether a statement to police was voluntary. (*Id.* at p. 1086.)

Like the trial court, we find no evidence of coercion in the police interview of White. While the police were insistent with her, they did not threaten White, either implicitly or explicitly. They lied when they said Dias had told them about the events on the night of the Casias killing, but nothing in the manner they presented that falsehood was likely to procure an untrue statement. The police did not suggest to White what Dias had told them, nor did they suggest what they expected White to tell them, other than generally to exculpate Dias. Particularly in the portion of the interview after the break, it was clear White was speaking rationally and voluntarily about her conversations with Dias.

Defendant analogizes these circumstances to those in *People v. Trout* (1960) 54 Cal.2d 576, disapproved on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 482. In *Trout*, police took the defendant's wife into custody, although they had no reason to believe she was involved in the crime. They then implied to the defendant that his wife would not be released unless he confessed, repeatedly bringing her into the room to pressure him over the course of a 12-hour period. (*Id.* at pp. 584–585.) The court characterized this approach as imposing "improper pressure" on the defendant. (*Id.* at p. 585.) There are several differences here. Perhaps most important, police did not wrongfully detain a family member of White and use that person as leverage to obtain a statement. Although Dias was being held at the time of the interview, police did not suggest her freedom depended upon White's cooperation. It is not even clear White was aware at the beginning of the interview of Dias's detention. In addition, police did not threaten to falsify charges against Dias. As White was aware, Dias had been in the room when defendant shot Casias, and her role was therefore legitimately in question. They

7

urged White to supply information in order to clarify Dias's role and avoid the possibility of criminal charges. The police tactics here embodied the difference between patient persuasion and coercion.

Defendant also cites *People v. Lee* (2002) 95 Cal.App.4th 772, but, as noted above, police never suggested to White what they expected her to tell them, nor did they threaten to bring charges directly against her. In contrast, the witness in *Lee* was expressly threatened with prosecution for murder if he did not implicate the defendant. (*Id.* at pp. 783–784.)

Defendant also contends the trial court was required to modify its instruction on the jury's use of White's statements to take account of the possibility they were involuntary, citing *People v. Underwood* (1964) 61 Cal.2d 113 (*Underwood*). In *Underwood*, there was "uncontradicted evidence" that a witness's prior inconsistent statements, admitted for impeachment purposes, were involuntary as a result of police coercion. (*Id.* at p. 118.) The court held it was error to admit the statements, explaining, "The same policy considerations which preclude the use of an involuntary statement of a defendant require that the prosecution be precluded from impeaching any witness by the use of an involuntary statement given as the result of pressures exerted by the police." (*Id.* at p. 124.) Yet despite ruling the statement inadmissible, the court also held it was error to instruct the jury "*without qualification* that it was permissible to consider prior inconsistent statements of a witness for purposes of testing his credibility." (*Id.* at p. 125.) Defendant concludes from *Underwood* that, when a defendant contends a witness's statement is involuntary, the trial court has a duty to instruct the jury that it should consider the voluntariness of the witness's statement when judging credibility.

We take a different lesson from *Underwood*. When, as in *Underwood*, there is uncontradicted evidence that a witness's statement was involuntary, the statement must be excluded. This is consistent with current case law. (E.g., *People v. Badgett, supra*, 10 Cal.4th at p. 344.) The court has a duty to modify the instruction on use of the statement only if, as in *Underwood*, an involuntary statement has been improperly admitted.

8

When, as here, the trial court holds a hearing and rejects the contention that a challenged statement was involuntary, the statement may be admitted, and there is no duty to modify the ordinary instructions on the use of the statement. Any other holding would require the jury to hear the evidence regarding voluntariness, thereby opening the proceedings to extended testimony about the circumstances of the statement. In effect, it would transfer the task of determining the voluntariness of the statement from the court to the jury.

In any event, the Supreme Court has held that when the evidence of coercion is in dispute, the court has no duty to modify an instruction under *Underwood* in the absence of an appropriate request by defense counsel, which was absent here. (*People v. Ervin* (2000) 22 Cal.4th 48, 83.) As the court explained: "The court did instruct [citation] that a witness's prior inconsistent statements may be considered to test the witness's credibility and also as evidence of the truth of the facts stated. Likewise, the court instructed the jury that it could consider 'the existence or nonexistence of a bias, interest or other motive' in evaluating witness testimony. Given the conflicting evidence on the voluntariness of [the witness's] statement, no further instructions were required in the absence of a defense request on that subject. [Citation.] As a practical matter, most jurors would realize that promises of leniency or other coercion could induce false statements." (*Ibid.*) The same instructions given in *Ervin* were given here.

Yet even if White's statement had been improperly admitted or the instruction regarding the use of prior inconsistent statements was improper, we find any error was harmless under both *People v. Watson* (1956) 46 Cal.2d 818, 836 and *Chapman v. California* (1967) 386 U.S. 18. Dias also told Joyce Lopez, whose testimony was not challenged, that defendant had shot someone in front of her. The information supplied by White was therefore available to the jury through another witness. Moreover, the evidence of defendant's guilt was strong. Defendant himself was quoted as saying he had "stuck someone" that night, after displaying a handgun. Gomes testified she left him alone in her house with Dias prior to the killing, and the GPS tracking device showed

9

defendant left the home around the apparent time of the murder.  Before the fire was set, defendant sought the keys to Gomes's home.

## B.  *Failure to Disclose Prosecutor Notes*

When the defense called Shaw to testify about the Olson shooting, she recanted significant aspects of the account she gave police.  On cross-examination, the prosecutor attempted to demonstrate Shaw recanted her testimony from fear of reprisal.  As part of that strategy, the prosecutor questioned Shaw about a discussion he had with her in June, two months before trial, when the prosecutor and an inspector served a subpoena on Shaw.  The prosecutor suggested, through his questions, that Shaw had told them "people were in your face for snitching" as a result of her identification of defendant to police.  One person, known as "Porky," had attacked her with a cane.  The inspector was called to confirm the prosecutor's version of the discussion, and the next day a detective testified that he had noticed Porky in the courtroom audience on the day Shaw was scheduled to begin testifying.

The prosecutor had made notes of his June conversation with Shaw, but he did not disclose them to the defense until after the first day of Shaw's testimony, explaining he did not think the conversation was relevant until he heard Shaw's testimony.  The next day, defense counsel moved for a mistrial, claiming she would not have called Shaw as a witness had she known about the June discussion.  The trial court denied the motion, but it instructed the jury with respect to the prosecutor's late disclosure.

Based on counsel's claim that she would not have called Shaw as a witness had the notes been disclosed to her earlier, defendant contends the prosecution's failure to disclose the notes denied him effective assistance of counsel.

To prevail on a claim of ineffective assistance of counsel, a defendant "is required to show both that counsel's performance was deficient and that counsel's errors prejudiced the defense."  (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.)  Prejudice is shown if there is "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

10

We find it unnecessary to determine whether the prosecutor's failure to disclose denied defendant effective assistance of counsel because there is no reasonable probability the outcome of the trial would have been different if the prosecutor had made a timely disclosure of his notes. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1169.) The evidence incriminating defendant in the Olson shooting was very strong. Olson, who had known defendant since childhood, identified him as the shooter both immediately after the shooting and later in court. Shaw's statements to police tended to support this testimony. GPS tracking device information placed defendant at the scene of the shooting, and police later found clothing bearing defendant's DNA and gun powder residue in a field defendant had passed through while leaving the scene of the shooting.

Defense counsel represented to the trial court she would not have called Shaw as a witness had she known of the notes. Apparently, counsel was concerned that the exculpatory value of Shaw's testimony, establishing the possibility of a different shooter, was outweighed by the prejudicial effect of having the jury learn Shaw had been harassed for making statements to police and Porky had appeared in court with the possible intent of influencing her testimony. It is true the testimony about "snitching" and Porky undermined the value of Shaw's testimony by suggesting it had been changed under pressure. It also may have cast some suspicion on defendant's conduct, although there was no testimony connecting him to the attempts to influence Shaw. Had Shaw not testified, however, there would have been no evidence to refute Olson's identification of his attacker. We have no reason to believe the testimony about the attempts to influence Shaw had a materially greater adverse impact on the defense than the complete absence of Shaw's testimony would have had. In light of the strength of the incriminating evidence discussed above, any negative impression the jury might have taken from the testimony was unlikely to have had a material bearing on its verdict. For the same reason, we find no merit in defendant's constitutional claims of denial of due process and the right of confrontation.

In his discussion of prejudice, defendant argues the prosecutor's failure to provide the notes in a timely manner "undercut the only favorable defense evidence" for the

11

attempted murder charges.[6]  It was not the prosecutor's untimely disclosure, however, that undercut the value of Shaw's testimony.  As discussed above, defense counsel represented she would not have called Shaw at all if the notes had been disclosed earlier.  *Timely* disclosure therefore would have resulted in the complete absence of "the only favorable defense evidence."  For that reason, any prejudice from the disclosure must be determined by weighing the prejudicial effect of the disclosure that pressure had been exerted to influence Shaw's testimony, which the jury would not have heard had Shaw not been called, against the absence of Shaw's testimony.  As discussed above, we conclude any adverse impact was not prejudicial under the appropriate standards for harmless error.

## C. *Refusal to Grant Immunity to Richard McDonald*

Defendant contends his right to due process was denied when the trial court refused to grant use immunity to McDonald, the person from whom Shaw had stolen drugs.

Defendant attempted to call McDonald to support his theory he was misidentified by Olson.  When McDonald invoked his Fifth Amendment privilege against self-incrimination, defense counsel asked the court to grant use immunity for his testimony, arguing that without this testimony defendant would not get a fair trial.

Defense counsel apparently based her belief in the importance of McDonald's testimony on a police interview of McDonald after the shooting.  The trial court was not

---

[6] Defendant also argues at length that prejudice is presumed in circumstances where "the impediment to effective assistance comes *not* from defense counsel's own actions, but from the state itself."  While this may be one way to view the various "structural error" cases, it is hardly true that any impediment to effective assistance attributable to prosecutorial conduct requires reversal.  Rather, the presumption is applied " '[o]nly when the court concludes that the possibility of prejudice and the corresponding difficulty in demonstrating such prejudice are sufficiently great compared to other more customary assessments of the detrimental effects of deficient performance by defense counsel.' " (*People v. Hernandez*, *supra*, 53 Cal.4th at p. 1107.)  Given the specific nature of the claimed consequences from the prosecutor's failure, the circumstances here are readily amenable to a traditional prejudice analysis.

12

presented with a recording or transcript of the interview, but both attorneys characterized it for the court. The prosecutor claimed McDonald told police he recruited defendant, as a fellow gang member, to go to Olson's home to retrieve McDonald's drugs. Defendant agreed to go in part, McDonald said, because defendant "had a problem with Mitch Olson . . . regarding the defendant's girlfriend," a statement that bolstered the prosecution's theory of the case. Although McDonald denied having a firearm himself, the prosecutor said, McDonald believed defendant and Popeye probably had them. According to defense counsel, McDonald said Popeye had a gun and he never saw Popeye with a gun. He also said he did not know where defendant was at the time of the shooting and defendant was upstairs, away from the scene of the shooting. McDonald told police "[s]treets say it was Popeye that did the shooting," but he did not see Popeye shoot Olson. Based on this, defense counsel concluded "there's some evidence that this person would render which would tend to clear" defendant.

The trial court denied the request for use immunity. The court reasoned that, in order to justify granting immunity, the proposed witness's testimony must be "clearly exculpatory." The court found McDonald's testimony to be a mixed bag.

A defendant has no right to compel a grant of use immunity for defense witnesses (*In re Williams* (1994) 7 Cal.4th 572, 609), and our Supreme Court has never recognized an inherent power in the trial court to grant such immunity. On the contrary, the court has suggested it is " 'doubtful' " the power exists. (*People v. Stewart* (2004) 33 Cal.4th 425, 468.) Nonetheless, in several cases the Supreme Court has applied a hypothetical standard for such immunity, first articulated in *People v. Hunter* (1989) 49 Cal.3d 957. Under that standard, the defendant must justify use immunity by showing either (1) the " 'defendant [has made] a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case' " and " 'there [are] no strong governmental interests which countervail against a grant of immunity' " or (2) "the prosecutor intentionally refused to grant immunity to a key defense witness for the purpose of suppressing essential,

13

noncumulative exculpatory evidence." (*Id.* at pp. 974, 975; see *People v. Stewart*, at pp. 469–471.)

Defendant fell short of satisfying either test. Because McDonald's testimony was confused and contradictory, it had modest probative value. Defense trial counsel conceded as much when she characterized McDonald's testimony merely as offering "some evidence" that "would tend to clear" defendant. Defendant's current argument for the exculpatory value of McDonald's statements is based on a one-sided account that selectively disregards the contradictions rendering the testimony of little probative value. Most importantly, while McDonald told investigators defendant was upstairs at the time of the shooting, he utterly undermined the value of this "clearly exculpatory" statement by also stating he did not know where defendant was at the time. McDonald's remaining pertinent statements were similarly inconsistent, and they would have been largely cumulative of Shaw's testimony, in any event. Nor is there any reason to think the prosecution was withholding immunity for a wrongful purpose. The prosecutor identified for the court good reasons for withholding immunity, including the greater severity of McDonald's potential crimes than those of the witnesses to whom immunity had been granted. Further, the limited evidentiary value of McDonald's statements suggested there was little motive for the prosecution to manipulate the immunity process to suppress it. The mere fact the prosecution granted immunity to some witnesses and not to McDonald does not alone demonstrate improper use of the immunity power.

## D. *Purported Use of a Jailhouse Informant*

Defendant contends he was wrongfully convicted on the basis of the uncorroborated testimony of Olson, whom he characterizes as a "jailhouse informant."

Olson was in a coma for a considerable time after the shooting. Upon awakening, he declined to cooperate with police. A month later, he was arrested. While being transported from jail to a courthouse, Olson found himself on the same bus with defendant. Defendant passed him an apologetic note and thanked Olson for not cooperating. Recognizing its potentially incriminating nature, Olson passed the note back to defendant. After the bus arrived at the courthouse, an officer overheard Olson

14

talking about the incident with another inmate and discussed the events with him. At the time, the officer confirmed defendant was in the courthouse. The meeting on the bus apparently caused Olson to change his mind and give a statement to police describing the shooting.

Section 1111.5, subdivision (a) states that a defendant may not be convicted on the basis of the uncorroborated testimony of an in-custody informant, and section 1127a requires the giving of an appropriate jury instruction when the prosecution relies on informant testimony. The duty to instruct is sua sponte. (*People v. Davis* (2013) 217 Cal.App.4th 1484, 1489.)

Both statutes, however, define "in-custody informant" to exclude percipient witnesses. (§§ 1111.5, subd. (b), 1127a, subd. (a).) Because he was a witness to the shooting, Olson is excluded from the statutory definition of an in-custody informant. As the Supreme Court explained in *People v. Bivert* (2011) 52 Cal.4th 96, in holding the statutes inapplicable to incarcerated witnesses to a crime: "The Legislature recognized that in-custody informant witnesses differ in nature and character from in-custody percipient witnesses. Section 1127a and CALJIC No. 3.20 specifically distinguish between the two. In-custody informant witnesses have no personal knowledge of the crime, but testify that a defendant made an inculpatory statement to them while in proximity in a county jail or state prison, often in exchange for favorable treatment by law enforcement. In-custody percipient witnesses, by contrast, like other percipient witnesses, . . . testify on the basis of personal knowledge of the crime. . . . In order to lessen the possibility of any conviction being based on fabricated testimony, the Legislature offered additional guidance to juries in criminal cases involving in-custody informants." (*Id.* at pp. 120–121.) Defendant's briefing neither acknowledges the definitional language in the statutes nor discusses *Bivert*.

**E.** *The Flight Instruction*

Defendant contends the trial court erred by instructing the jury that a defendant's flight can be considered evidence of guilt, while not instructing the jury that evidence of the absence of flight can be considered evidence of innocence.

15

Section 1127c requires the court to instruct the jury "where evidence of flight of a defendant is relied upon as tending to show guilt" as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." The trial court complied with its statutory duty.

Defendant's contention that the trial court had a duty to deliver a "reciprocal" flight instruction has been rejected consistently by the Supreme Court. As the court explained in *People v. Staten* (2000) 24 Cal.4th 434: "In *People v. Green* (1980) 27 Cal.3d 1, 39–40 and footnote 26, we held that refusal of an instruction on absence of flight was proper and was not unfair in light of Penal Code section 1127c. We observed that such an instruction would invite speculation; there are plausible reasons why a guilty person might refrain from flight. [Citation.] Our conclusion therein also forecloses any federal or state constitutional challenge based on due process." (*Id.* at p. 459; see similarly *People v. Williams* (1997) 55 Cal.App.4th 648, 651–652.) As with the prior argument, defendant's briefing neither acknowledges nor attempts to distinguish this binding precedent.

## F. *Olson's Outbursts*

Following defendant's conviction, his appellate counsel learned of a confrontation between Olson and defendant that occurred when Olson was left on the stand while the court and counsel conferred outside the courtroom. In response to a request from counsel, this court entered an order directing the trial court to settle the record with respect to any such confrontation, and the court held a hearing at which the jurors were questioned individually about the event.

There was a general consensus among the jurors that Olson's testimony was angry, animated, and punctuated by outbursts, although not necessarily at defendant. Out of 12 jurors, nine did not remember any comments from Olson while the court and counsel were absent. One juror, however, remembered that on one occasion while the

16

court and counsel were absent, after a couple minutes of silence, Olson looked at defendant and said, " 'Man, I can't believe you did this to me.' Something to that effect." Olson then became quiet again. Defendant neither provoked the comment nor responded to it. Another juror remembered Olson saying, " 'Why did you do this, man? Why did you shoot me?' " At the time, Olson was "very angry," and "there [were] a few curse words being thrown at [defendant]." In response, defendant shrugged and looked away. The bailiff then told Olson to calm down, and he responded, " 'This is bullshit. Why am I here?' " At some point, Olson leaned forward as though he might attack defendant, and the bailiff sat next to him. A third juror remembered Olson said something and made "a little movement" during a break, but the juror could not hear what was said. We assume for purposes of defendant's argument that this event occurred as the two jurors remembered: while counsel and the court were absent, Olson angrily accused defendant from the stand of shooting him.

We decline to decide whether this incident deprived defendant of due process or Sixth Amendment rights because we find it harmless under any standard. Contrary to defendant's claim that prejudice must be presumed here, the Supreme Court has held: " 'A complete denial of counsel at a critical stage of the proceedings' is sufficient to trigger the *Cronic*[7] presumption of prejudice. [Citation.] 'But when the defendant is represented by counsel, the [*Cronic*] presumption of prejudice will only stand when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing." (*People v. Banks* (2014) 59 Cal.4th 1113, 1170–1171; see similarly *People v. Lightsey* (2012) 54 Cal.4th 668, 700 ["where the denial of counsel was for a discrete time or hearing only, . . . . the denial of the right to counsel, even during a critical stage in a capital case, does not require automatic reversal but is instead subject to harmless error review"].) Defendant did not suffer a "complete denial" of counsel, as a result of which the prosecution's case was not subjected to adversarial testing. On the contrary, his

---

[7] *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*).

17

attorney aggressively contested the matter from start to finish. On this occasion, she merely left the room for a few minutes, accompanied by the court and the prosecutor.

While the outburst is regrettable, Olson did nothing more than repeat, with more force, the claim that defendant shot him, a point he had already made in response to questioning in the presence of defendant's attorney. Olson did not provide the jury with otherwise inadmissible information, and it hardly came as a surprise to the jury that Olson was furious with defendant over the shooting. There is no reason to think this incident had any impact on the jury's verdict, let alone that it satisfied the tests for prejudice of *People v. Watson*, *supra*, 46 Cal.2d 818, 836 or *Chapman v. California*, *supra*, 386 U.S. 18.

## III.  DISPOSITION

The judgment of the trial court is affirmed.

18

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.